IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHRISTOPHER GOODVINE,

                        Plaintiff,                    OPINION AND ORDER

        v.                                            12-cv-134-wmc

GARY ANKARLO, KEVIN BOODRY,
NICHOLAS BREDEMAN, NICHOLAS BUHR,
SONNETTE CALDWELL-BARR,
WILLIAM CONROY, JEFF HEISE,
TRACY JOHNSON, MICHAEL JULSON,
PATRICK KUMKE, TERESA MCLAREN,
MICHAEL MEISNER, RAYMOND MILLONIG,
DONALD MORGAN, ANDREA NELSON,
JANEL NICKEL, SEAN SALTER,
RANDY SCHNEIDER, JEREMY A. WILEY and
JASON WITTERHOLT,

                        Defendants.

        Plaintiff Christopher Goodvine filed this lawsuit pursuant to 42 U.S.C. § 1983,

alleging violations of his constitutional rights while incarcerated by the Wisconsin

Department of Corrections ("WDOC") at the Columbia Correctional Institution ("CCI")

in Portage.  He contends primarily that defendants failed to prevent him from engaging

in acts of self-harm, usually (but not exclusively) by cutting himself with sharp objects,

on four occasions in October 2011, as well as a fifth occasion in July 2012.  Along with

common law malpractice claims against certain WDOC medical staff, he also contends

that he was denied a constitutional right to (1) adequate medical care following one

instance of self-harm and (2) placement for mental health care at the Wisconsin Resource

Center ("WRC").  He further contends that prison policies and procedures are generally

inadequate to keep him safe from self-harm.

On February 7, 2013, the court granted in part plaintiff's request for a preliminary injunction in light of:  the life-threatening nature of at least one of plaintiff's acts of self-harm;  the severity of other such acts;  the apparent inability of CCI to prevent the plaintiff from procuring or fashioning sharp objects;  and the opinions of WDOC's own psychiatrist and psychologist that plaintiff would likely engage in equally dangerous acts in the future, whether because of a compulsive/obsessive disorder, other mental illness or, as they had concluded, a desire to manipulate staff.  Specifically, the court required prison officials to place Goodvine in "observation" status and/or restraints as soon as reasonably practicable after plaintiff reports a strong urge to harm himself.  (Dkt. # 59.)  After defendants filed a joint motion for summary judgment on all of plaintiff's claims (dkt. # 73), the court appointed a neutral psychiatric expert, Dr. Kenneth I. Robbins, to assist in resolving the claims in this case.  (Dkt. # 109.)  Dr. Robbins has since filed his own evaluation of Goodvine, possible treatment and report in this case.  (Dkt. # 166.)

The parties have also conducted extensive discovery in connection with plaintiff's claims.  Defendants subsequently filed an amended brief in support of their motion for summary judgment.  (Dkt. # 212.)  In response to which Goodvine cross-moved for summary judgment.  (Dkt. # 234.)  Although he has more than capably litigated this case on his own to date, Goodvine also continues to seek assistance from the court in locating volunteer counsel, as well as leave to supplement or amend the complaint with new allegations, additional injunctive relief, and sanctions against defendants for failure

to comply with the preliminary injunction. The pending motions are addressed below following an overview of the parties, the claims and the pertinent facts in this case.[1]

## PARTIES

After screening the pleadings pursuant to the Prison Litigation Reform Act, 28 U.S.C. § 1915A, the court granted (likely in retrospect inadvisedly) Goodvine leave to proceed with claims against 20 defendants. (Dkts. # 21, # 40, # 61.) Several of the defendants are supervisory officials, including Dr. Gary Ankarlo, who is the Director of Psychological Services for the WDOC in Madison, CCI Warden Michael Meisner and CCI's Security Director Janel Nickel. Several of the defendants are psychologists or psychological associates working at the CCI Psychological Services Unit ("PSU"), including: Nicholas Buhr, Sonnette Coldwell-Barr, Tracy Johnson, Patrick Kumke, Teresa McLaren and Andrea Nelson. Defendant Jeff Heise is a psychologist who serves as Admissions Coordinator at the WRC, which is a state mental health facility operated by the Department of Health Services ("DHS") in Winnebago. The remaining defendants are correctional or security personnel at CCI, including: Lieutenant Kevin Boodry, Lieutenant Nicholas Bredeman, Officer William Conroy, Officer Michael Julson, Officer Raymond Millonig, Captain Donald Morgan, Captain Sean Salter, Sergeant Randy Schneider, Officer Jeremy A. Wiley and Officer Jason Witterholt.

---

[1] These facts, which are taken largely from the parties' undisputed, proposed findings, the voluminous medical and psychological notes and related records, are viewed in a light most favorable to Goodvine.

CLAIMS

As already mentioned and outlined more fully below, the pending complaint concerns five distinct incidents in which Goodvine inflicted harm upon himself while housed in disciplinary segregation at CCI.  In particular, Goodvine contends that Dr. Kumke, Dr. Nelson, Dr. McLaren and Sergeant Schneider failed to protect him from self-harm that occurred on October 1, 2011.  Goodvine contends that Dr. Kumke, Dr. McLaren, Officer Millonig and Officer Witterholt failed to protect him from self-harm that occurred on October 5, 2011.  Goodvine contends that Dr. Johnson, Dr. Kumke, Dr. McLaren and Officer Julson failed to protect him from self-harm that occurred on October 12, 2011.  Goodvine claims that Dr. Johnson, Officer Conroy and Officer Wiley failed to protect him from self-harm that occurred on October 13, 2011.  Goodvine contends that Dr. Buhr, Dr. Caldwell-Barr, Lieutenant Boodry, Lieutenant Bredeman, and Captain Salter failed to protect him from self-harm that occurred on July 16, 2012.  Goodvine also contends that Drs. Buhr, Johnson, Kumke, McLaren and Nelson were medically negligent or committed malpractice by providing sub-standard mental health care on each of the above-referenced occasions.

In addition to these claims, Goodvine contends that Ankarlo and Heise were deliberately indifferent to his need for mental health treatment by refusing to place him at WRC in February 2012.  (*See* Dkt. # 21, at 8-9.)  Goodvine contends further that the supervisory defendants (Meisner, Nickel and Morgan) failed to implement policies or procedures to keep him from harming himself at CCI.  In that regard, Goodvine argues that defendants were deliberately indifferent to his need for protection from self-harm by

4

failing to adopt a policy that would place him in "therapeutic restraints," among other alternatives, at his request.

GENERAL BACKGROUND

Goodvine is a male inmate in his early 30's who has been incarcerated by DOC since 2003. With the exception of transfers to WRC for treatment or stabilization, he has been in custody at CCI continuously since 2009.

Goodvine grew up in Milwaukee, almost certainly the product of an abusive home. For example, his mother and her boyfriend reportedly used drugs and beat him frequently. He ran away at the age of 12 or 13 and began committing crimes, resulting in his placement at one or more group homes. When not in foster care, Goodvine supported himself by selling drugs and staying in neighborhood "drug houses." He has reported cutting himself at least twice a month since the age of 12, resulting in many emergency room visits and at least five or six stays in psychiatric hospitals related to his thoughts of self-harm. While marijuana has been his drug of choice since the age of 11, Goodvine also has a history of using or abusing alcohol, hallucinogens and ecstasy.

At the age of 15, Goodvine was incarcerated at the Lincoln Hills School.[2] He was sentenced to state prison as an adult for the first time at the age of 17, after assaulting a guard at the Lincoln Hills facility. Goodvine was out of prison from 2001 through 2003,

---

[2] The facts underlying Goodvine's criminal history are set forth in the psychological evaluation conducted by Dr. Anna C. Salter. (Ex. # 101, at 142-47.)

living on the streets and selling drugs to support himself.  In 2003, he was convicted of first-degree recklessly endangering safety and substantial battery causing intentional bodily harm in Milwaukee County Case No. 2002CF4916, as well as unlawful possession of a firearm by a felon in Milwaukee County Case No. 2002CF5261.  While imprisoned in 2007, Goodvine was also convicted of battery by a prisoner for assaulting a correctional officer, who he punched in the face.  *See* Columbia County Case No. 2007CF266.  On September 28, 2011, Goodvine repeatedly punched and stabbed another inmate with a weapon he had made from pencils.  As a result of that incident, which was captured on surveillance video, Goodvine has been charged with yet another felony for battery by a prisoner in Columbia County Case No. 2012CF85.  That case remains pending.

In addition to his criminal record, Goodvine has a lengthy record of misconduct while in prison.  (Dkt. # 90, Ex. 1.)  As of March 7, 2012, Goodvine had amassed 106 major conduct reports and 27 minors.  (Ex. # 101, at 155.)  Among others, these offenses include battery, disobeying orders, disruptive conduct, disfigurement, threats, damage/alteration of property, possession of contraband, lying, group resistance and petitions, manufacturing a weapon.

Unsurprisingly, as a result of these repeated instances of misconduct, Goodvine has resided in disciplinary segregation for much of the time period pertinent to this lawsuit.  Also unsurprisingly, Goodvine has continued to struggle with a number of serious mental or psychiatric conditions while incarcerated.

According to the expert report prepared by the court's neutral expert, Dr. Robbins, Goodvine feels "anxious and sad" much of the time, intermittently to the point that he feels "out of control" and believes he must cut himself or kill himself to decrease the intensity of his pain.  He has difficulty managing his emotions and maintaining his motivation, attention and concentration.  Goodvine reports that these feelings are much worse when he is in segregation, where there is little to do, while in the past he was able to manage his psychiatric symptoms by distracting himself with activities or with substance abuse.  Goodvine is sensitive to criticism and believes he is treated poorly by security staff, particularly in segregation.  He often feels angry about the "lack of respect" he believes he has been shown.  He has cut himself, taken overdoses, or attempted to suffocate himself numerous times, as documented in WDOC records.  He believes he has injured himself at least 50 times while incarcerated, but suspects it is likely closer to 100 times.  He believes he has been sent to the hospital at least 20 times related to his self-injury.

Goodvine has been diagnosed with a borderline personality disorder.  According to Dr. Robbins, this diagnosis is based on his long history of unstable interpersonal relationships, an unstable self-image, emotional or affective instability with recurrent suicidal and self-mutilating behaviors, chronic feelings of emptiness and marked impulsivity. *See also* AMER. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL 663-64 (5th ed. 2013) (noting that individuals with borderline personality disorder commonly display "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior," with "completed suicide" occurring in 8%–10% of such individuals).

Goodvine has also has been diagnosed with antisocial personality disorder, which is a form of "psychopathy" or "sociopathy" featuring a "pervasive pattern of disregard for, and violation of, the rights of others," as well as frequent use of deceit and manipulation as a means to procure some form of secondary gain. *See also id*. at 659-60.

During his incarceration, Goodvine has been treated with a variety of antidepressant medications (including Prozac, Pamelor, Wellbutrin, Trazodone and Remeron), antipsychotic medications (including Loxitane, Thorazine, Seroquel and Risperdal), anti-anxiety medication (Buspar), and mood stabilizers (Depakote and Lithium).

## POLICIES, PROCEDURES AND
## CONDITIONS OF CONFINEMENT AT CCI

CCI has three segregation units:  Disciplinary Segregation 1 (DS-1), Disciplinary Segregation 2 (DS-2), and the Special Management Unit (Unit 7).  DS-1 houses inmates who have just arrived in segregation or are having behavioral problems and have been placed in observation.  DS-2 is a transitional or "step-down" unit that houses inmates who have been in DS-1.  Unit 7 serves a variety of purposes, but mainly houses the severely mentally ill and other vulnerable inmates.

CCI employs 6 psychologists, a crisis intervention worker and a program assistant. Each unit has an assigned psychologist. Inmates at CCI are informed that if they need to see PSU staff immediately (urgent/emergent-type situations), they need to alert unit staff of their problem or concern.  PSU staff responds directly to the units in emergencies or urgent situations when contacted or asked to do so by unit staff. If an inmate requires

non-emergency psychological attention they must submit a Psychological Services Request ("PSR") to the PSU. PSU staff triage the PSRs daily and will schedule an inmate for an appointment with PSU staff if his stated problem requires attention. If the request is urgent or emergent in nature, arrangements will be made for a same-day or immediate evaluation as determined by PSU staff.

In addition to providing care on an "as needed" basis, PSU staff conducts routine rounds in the segregation units, going to the cell front and talking to the inmates. On the two, more acute units -- DS-1 and Unit 7 -- routine rounds are generally conducted every week, but psychological staff may see an inmate at cell front more frequently if staff or the inmate requests that he be seen.

CCI operates under a "unit management" concept, which means that all correctional employees on a given cell block, tank, pod or wing work as a team to provide custody, support and rehabilitative services in a single coordinated package.[3] All inmates in the segregation building are reviewed by members of the unit team on a weekly basis. All inmates on the segregation building are discussed formally or informally at least weekly. If staff members observe subtle changes in inmates, this information can be shared and promptly followed-up on if necessary. Information is shared between PSU, Health Services Unit ("HSU") and security staff to promote awareness of inmate concerns and so that staff can monitor inmates closely. Defendants note that it is not

---

[3] ALLEN, HARRY E., LATESSA, EDWARD J. & PONDER, BRUCE S., CORRECTIONS IN AMERICA 150 (12th ed. 2010); *see also gen*. Houston, James G., *Unit Management*, in ENCYCLOPEDIA OF PRISONS & CORRECTIONAL FACILITIES 981-86 (M. Bosworth, ed., 2005) (explaining that unit management is decentralized and that inmates are under the primary supervision of a semi-autonomous team responsible for a self-contained area within the larger institution).

uncommon for segregation inmates to prompt others in segregation to commit self-harm. While this poses a challenge, unit staff attempts to manage this dynamic by using the limited resources available to separate inmates who may pose a negative influence on other inmates that may result in self-harm behaviors.

Security personnel at CCI are trained to address the problems associated with mental illness in the prison population, including those who engage in self-harm or suicidal conduct.  Officials at CCI have adopted a number of institutional policies and procedures to protect inmates from self-harm.[4]  Measures have been put in place to decrease the risk of self-harm and suicide in DOC facilities, including: staff training, early identification of at-risk inmates, prompt intervention, effective treatment in accordance with professional judgment and standards, and collaboration among staff.  CCI staff members working in the segregation units, in particular, receive "Crisis Intervention Training" to facilitate an understanding of mental illness.

CCI has established additional measures to decrease the risk of self-harm by vulnerable inmates in DS-1, including:

- inmates are strip searched before going to segregation, before an inmate is placed in a DS-1 cell, and before going into observation status;

- the cell is searched to remove any contraband or damaged items in that cell that could be used for self-harm;

- mail is inspected for contraband;

- unit staff conduct frequent searches of segregation and observation cells;

---

[4] Goodvine disputes that the procedures described in this section are followed with regularity by security staff at CCI or, if used, that they are effective in preventing self-harm.

- unit staff conduct frequent rounds of the segregation unit to visibly identify that inmates are not causing self-harm; and

- inmates are provided programming and counseling.

In addition, inmates in the DS-1 unit are limited in what property they may have. If there are safety concerns, certain restrictions may be imposed to prevent that inmate from causing self-harm. Restrictions may be individualized based on the type of self-harm or threat posed by the inmate. Some of the restrictions may include:

- sharps (for inmates that have used hard plastic items to cause self-harm; this restriction includes placing the inmate on a "bag meal" that does not require the use of eating utensils);

- officer controlled medication (for inmates that have abused or attempted to overdose on stored up medication);

- "hook for medication" (for inmates who are "mouthing meds" or storing up medication in their cells);[5]

- linen (for inmates who may use linens in an attempt to hang themselves);

- pen insert (to prevent inmates from using metal parts or hard plastic found in a pen insert to cause self-harm); and

- other restrictions that may be specific to the self-harm gesture/attempt would be considered.

Defendants note that these forms of restriction are not punitive measures.  Rather, they are simply a tool used on the segregation unit to manage the disruptive types of behaviors exhibited by inmates and to protect the inmate and staff when an inmate's behavior poses a serious risk to the health and safety of the inmate and/or others.

---

[5] "Hook for medication" means that a prisoner is handcuffed to his cell door while his medication is administered.  (Dkt. # 247).

OBSERVATION STATUS

Numerous times during his confinement in disciplinary segregation, Goodvine has been placed in "observation status" for his own safety.[6]  Observation status is a highly restrictive, non-punitive placement that is used to ensure the safety of the inmate or the safety of others.  *See* WIS. ADMIN. CODE § DOC 311.04(1).  An inmate may be placed in observation for mental health purposes if (a) the inmate is mentally ill and a danger to himself or herself or others; or (2) the inmate is dangerous to himself or herself.  *Id*.  An inmate is considered "dangerous" and therefore amenable to a mental health placement in observation if there is "a substantial probability that the inmate will cause physical harm to himself or herself or others" as manifested by any of the following:

a.  Recent homicidal or other violent behavior.

b.  The reasonable belief of others that violent behavior and serious physical harm is likely to occur because of a recent overt act, attempt or threat to do such physical harm.

c.  Serious self-destructive behavior or a threat of such behavior.

d.  The inability to cope with life in the institution to the degree that himself or herself or others are thereby endangered.

WIS. ADMIN. CODE § DOC 311.04(3).   If -- in the opinion of a clinician, crisis intervention worker, or physician -- observation is not sufficient to properly handle the mental health concerns of a particular inmate, commitment procedures under Wis. Stat. § 51.20 or transfer procedures under Wis. Stat. § 51.37(5) may be pursued.  WIS.

---

[6] The observation area is located directly behind the officer's station in DS-1.  There are six cells within this area, each one featuring large, plexiglass doors, windows and fronts to allow for better observation.  Four of these cells have in-cell security cameras.  When the six observation cells in DS-1 are full, inmates placed in observation status are monitored while housed in a regular cell.

ADMIN. CODE § DOC 311 (Appendix).  Mental health institutions, however, are generally reluctant to accept transfers of inmates for placement under these provisions, presumably for reasons of institutional safety, security and cost.  *Id.*

An inmate may be placed in observation status by a clinician, crisis intervention worker, physician, the Warden, a registered nurse, or physician's assistant.  WIS. ADMIN. CODE § DOC 311.04(4)(a)-(c).  An inmate may also be placed in observation status by the security director or shift captain if a clinician, crisis intervention worker or physician is not available for consultation either directly or by telephone.  § 311.04(4)(d).

Any property that an inmate can use to injure himself is supposed to be removed before he is placed in observation.  Any staff member with authority to place an inmate in observation may change the inmate's conditions of confinement by imposing restrictions in observation if the staff member reasonably believes any of the following are true:

    a.  Privileges or properties may be used by the inmate or another inmate also in the observation unit for self-harm or to harm others.

    b.  Properties cannot be moved conveniently to the observation cell.

    c.  Privileges cannot be offered due to the secured nature of the observation unit.

    d.  Properties or privileges are clinically or medically contraindicated.

WIS. ADMIN. CODE § DOC 311.14(1).

For example, PSU clinicians have the discretion to choose which level of observation they believe is appropriate in the situation: close observation; constant observation; mechanical restraints; or closed circuit television monitoring.  Every inmate

who is placed in clinical observation shall, at a minimum, be placed in close observation status.  While in close observation, security staff shall check on and briefly observe the inmate's activities at staggered intervals not to exceed 15 minutes. Observations shall take place at cell-front and be recorded on a particular ledger or form for that purpose, referred to as "DOC-112."

Inmates at high risk for imminent suicidal behavior are placed on constant observation.  Constant observation involves continuous line-of-sight monitoring by correctional officers whose task is dedicated to the monitoring.  Observations in constant observation shall be recorded in a DOC-112 at intervals not to exceed 15 minutes. Closed circuit television monitoring may be used in addition to, but never as a substitute for, these monitoring levels.

PSU staff is responsible for determining the level of supervision (close or constant observation) while an inmate is in observation status.  This determination is made based on the clinician's observation, review of the situation, and professional judgment.  Any decrease in the level of supervision must be authorized by PSU staff or a physician.

An inmate may require mechanical restraint while in clinical observation status. Commercially manufactured devices used according to the manufacturer directions in order to restrict or impede free movement of the inmate's hands/arms, feet/legs, and/or torso. Restraint materials may include leather, vinyl, nylon, canvas, or rubber. Bed restraints, restraint chairs, and mitts are examples of acceptable restraints.


REFERRAL FOR TREATMENT AT WRC

CCI psychologists also have the professional discretion to refer any inmate-patient to the WRC, which is run by the Wisconsin Department of Health Services (DHS"), not WDOC.[7]  A prisoner may be referred to WRC for two reasons: (1) to treat a specific mental illness; and (2) to enable them to develop coping skills that will allow them to function in a regular correctional environment such as CCI.  The fact that a patient is referred to WRC, however, does not mean that WRC will accept the patient. WRC and individual WDOC institutions negotiate most transfers on a case-by-case basis. Ultimately, WRC has the discretion to determine which patients it will accept, and PSU personnel working at WDOC facilities have no power to compel them to accept a particular patient.

## OVERVIEW OF GOODVINE'S TREATMENT AT CCI:
## OCTOBER 2010 THROUGH OCTOBER 2011

It is undisputed that Goodvine received extensive mental health treatment while confined at CCI, including therapy and acute psychological services by PSU staff.[8]

---

[7] WRC operates 14 units with an operating capacity of 314 DOC inmates.  Of those units, three are reserved for inmates who need to improve daily living skills, such as personal hygiene.  Three other units are for inmates who need work on advanced social skills.  There are three "high management" security units for segregation placements and two units for inmates with acute psychiatric problems.  In addition, one unit is designated for intake and assessment, while two other units are set aside to prepare inmates for transfer back to DOC facilities or for release back into the community.

[8] Defendants have provided 230 pages of treatment records for care received by Goodvine between September 2010 and early 2013.  (Ex. # 101, attached to dkt. # 80.)  These records document care provided by psychologists at CCI for the time period relevant to this lawsuit. These records indicate that Goodvine also received care from other PSU staff members who are not defendants here, as well as medical staff at CCI and Divine Savior Hospital in Portage for routine and emergent medical issues.

Following a suicide attempt in September 2010, Goodvine spent three weeks at the WRC for the purpose of stabilization.  Upon his return to CCI in October 2010, Goodvine was examined by Dr. Leslie Baird for potential placement in observation.  (Exh. # 101, at 1).  Although Goodvine denied having any suicidal intentions, Dr. Baird determined that observation was warranted because Goodvine wrote in a letter while at WRC that he would "stop at nothing to kill himself" if he was returned to a WDOC segregation unit.  (*Id.*).  Dr. Baird classified him with a mental health code of MH-1,[9] and made a plan to continue routine monitoring for his diagnoses of Axis I Mood Disorder NOS (Not Otherwise Specified) and Axis II Antisocial Personality Disorder.[10]

On October 18, 2010, Dr. Baird and members of PSU staff followed up by monitoring Goodvine while he was in observation.  Goodvine remained in observation until October 20, 2010, when he assured Dr. Baird that he was not at risk to harm

---

[9] DOC classifies inmates' mental health needs according to the following system:

- MH-0. Inmates classified as MH-0 have no mental health needs.
- MH-1. Inmates classified as MH-1 have some mental health needs but are not considered seriously mentally ill.
- MH-2A. Inmates classified as MH-2A have one or more Axis I disorders that rise to the level of serious mental illness.
- MH-2B. Inmates classified as MH-2B have one or more Axis II disorders that rise to the level of serious mental illness.

(Dkt. # 76, Aff. of Gary Ankarlo, ¶ 21).

[10] "Axis I disorders" are clinical disorders, including major mental disorders, learning disorders, and substance use disorders. (Dkt. # 76, Aff. of Gary Ankarlo, ¶ 16).  Common Axis I disorders include depression, anxiety disorders, bipolar disorder, schizophrenia, and eating disorders such as anorexia nervosa and bulimia nervosa.  (*Id.*).  "Axis II disorders" include personality disorders such as narcissistic personality disorder, borderline personality disorder, antisocial personality disorder, and obsessive-compulsive personality disorder.  (*Id.* at ¶ 17).

himself. (Exh. # 101, at 6). Dr. Baird met with Goodvine several more times in October 2010, reviewing adjustments to his medication regimen (Lithium, Loxapine, Mirtazapine, Quietiapine) prescribed by a unit psychiatrist (Dr. Maier) and advising him about the treatment interventions that were planned for him, which would require him to demonstrate willingness rather than willfulness. (Exh. # 101, at 9, 12). Dr. Baird advised Goodvine that part of his treatment depended on his willingness to stop resorting to self-harm as a "default," rather than using the coping skills he was learning. (*Id*. at 9).

On November 5, 2010, Dr. Baird met with Goodvine out of his cell at his request. (Exh. # 101, at 11). Goodvine asked about whether Baird would consider making a recommendation to the security director to lift his restrictions. Dr. Baird presented information on mindfulness skills and he was given worksheets to complete independently before his next weekly session.

On November 10, 2010, Goodvine reported having a desire to "rip[] his arm open," noting that "there's many ways to carry that out." (*Id*. at 13). He also reported having urges to stop eating and drinking. Goodvine's cell was searched and he was placed in observation without incident. Later, however, Goodvine used metal from a "peak flow meter," which is a small, handheld device used by Goodvine to manage his asthma, to cut his right arm. (Exh. # 101, at 14). He was transported to the emergency room for treatment, which required over 20 stitches. (*Id*.)

Dr. Baird checked on Goodvine while he was in observation and he was continued in that status to ensure his safety. Goodvine told another clinician (Dr. Tobiasz) that he had stopped taking his medications. (Dkt. # 101, at 16). When Goodvine indicated

17

that he had made progress with Dr. Baird in the study of "core mindfulness skills," Dr. Tobiasz encouraged him to make use of these DBT (dialectical behavior therapy) skills when he was feeling upset, frustrated or depressed, as opposed to engaging in self-harm.[11] (Exh. # 101, at 18).  Goodvine indicated that he wanted to be transferred to WRC in the future for more extensive training in DBT skills.  On November 15, 2010, Dr. Tobiasz released Goodvine from observation after determining that he did not pose a threat to harm himself.

Goodvine continued receiving therapy during bi-weekly sessions with Dr. Baird. During one of these sessions on November 16, 2010, Goodvine acknowledged that his recent decision to self-harm was an impulsive act.  (Exh. # 101, at 19).  Dr. Baird advised Goodvine that he needed to let people know if he felt like acting on thoughts of self-harm.  Dr. Baird noticed that Goodvine did not come prepared for their session and had not completed his worksheets as assigned.  She indicated, however, that she would consider a referral to WRC.

---

[11] Dialectical behavior therapy or DBT is a modified form of cognitive behavioral therapy used for the treatment of chronically suicidal and self-injurious individuals with borderline personality disorder.  *See* Nat'l Alliance on Mental Illness (NAMI), *Dialectical Behavior Therapy Fact Sheet*, located at http://www.nami.org/factsheets/DBT_factsheet.pdf (last accessed March 19, 2014).  In DBT, the patient works on "accepting" uncomfortable thoughts, feelings and behaviors rather than struggling with them.  *Id*. DBT also focuses on the development of coping skills — specific behavioral techniques used to combat the disabling symptoms of mental illness.  *Id*. As part of the skills-based element of DBT, emphasis is often placed on the development of mindfulness practice and other relaxation techniques.  *Id.*  Whether these skills are taught during individual therapy sessions or weekly group therapy sessions, DBT has four skill modules:  (1) mindfulness; (2) interpersonal effectiveness; (3) distress tolerance; and (4) emotion regulation.  *See* Psych Central (2007), *An Overview of Dialectical Behavior Therapy*, located at http://psychcentral.com/lib/an-overview-of-dialectical-behavior-therapy/0001096 (last accessed March 19, 2014).

Goodvine was seen by Dr. Maier and Dr. Baird on November 17, 2010, to evaluate his medication regimen. (Exh. # 101, at 20). Goodvine reported feeling stressed about depositions in an unspecified court case, but was observed smiling and laughing at various points in the conversation.

On November 23, 2010, Dr. Baird met with Goodvine at his cell during clinical rounds. At that time, Goodvine reported that he was "struggling" with a growing feeling of despair. (Ex. # 101, at 21.) Goodvine had also declared a hunger strike. Dr. Baird asked whether he had tried to use coping skills rather than engaging in potentially self-destructive behavior and Goodvine indicated that he had tried a variety of things. He had not, however, attempted to complete any of his worksheets on the skills of mindfulness or acceptance.

When Goodvine inquired about a referral to WRC, Dr. Baird informed him that it was important to gauge his "treatment readiness" and that his noncompliance with treatment-related work was demonstrating a lack of commitment. Dr. Baird further observed that Goodvine did not appear willing to do anything different as he was currently engaging in a hunger strike, apparently without trying any of the treatment-related skills he had been provided. (Ex. # 101, at 21.) Goodvine disagreed, stating that the treatment expectations were "not fair." (*Id*.)

On December 1, 2010, Dr. Tobiasz met with Goodvine at his cell after a referral by security staff for possible placement in observation. (Ex. # 101, at 22.) When Dr. Tobiasz arrived, Goodvine indicated that he was concerned about his diet and asked Tobiasz to contact the HSU because he would like to receive a nutritional supplement

("Boost").   Noting that Goodvine was not at risk for self-harm, Tobiasz advised Goodvine that it was inappropriate to request placement in observation or to request PSU staff for the purpose of contacting HSU when he was able to do so on his own.

Dr. Baird met with Goodvine on December 8, 2010, to further discuss a referral to WRC.   (Ex. # 101, at 23-24.)   Baird reminded Goodvine that his treatment plan required him to demonstrate a commitment to treatment and willingness to engage in work similar to the program that he would be required to undertake at WRC.   Before a referral would be made, Goodvine needed to complete all four DBT modules (mindfulness, interpersonal effectiveness, distress tolerance, and emotion regulation) as this would be expected for the program at WRC.   Instead, she noted that Goodvine had several observation placements, had engaged in a hunger strike and had not completed his assigned work.   Dr. Baird advised him that he would not be referred to WRC before Christmas and encouraged him to participate in coping skills treatment and his regularly scheduled clinical contacts.   She also encouraged him to complete the remaining modules necessary for the DBT program.

At his next appointment on December 15, 2010, Goodvine completed all of his work accurately and in full.   (Ex. # 101, at 25.)   Dr. Baird praised Goodvine for completing the work in a timely manner and provided him with additional worksheets on distress tolerance as these appeared to be helpful in managing his stress effectively without self-harm.   Baird provided Goodvine with a copy of his DBT treatment plan on December 16, 2010.   The following day, Goodvine's referral to the DBT program was discussed with WRC admission staff.

On January 3, 2011, Dr. Baird submitted a referral for mental health placement to WRC for Goodvine's participation in the DBT program and to evaluate him for a potential eating disorder.  (Ex. # 101, at 226-27.)  In that referral, Dr. Baird noted that (1) Goodvine was assigned to segregation and (2) his personality disorder appeared to impede his ability to function optimally in segregation status.  Dr. Baird further noted that Goodvine had engaged in a pattern of self-harm while in segregation, as well as engaged in a pattern of litigation against DOC and encouraged other inmates to do the same while in segregation at CCI.[12]  According to Dr. Baird, this latter behavior reflects an exacerbation of his personality disorder in that Goodvine reportedly "sets up" staff members for this type of litigation.  As an example, Dr. Baird noted that Goodvine recently filed a lawsuit claiming an eating disorder that had gone untreated while in WDOC.

Dr. Baird also noted that Goodvine had engaged in self-harm and hunger strikes in the recent past, which Goodvine claimed were related to an eating disorder and concerns about his appearance, though this had not been consistent.  Dr. Baird opined that:  (1) Goodvine's symptoms appeared primarily related to his personality disorder; and (2) there often appeared to be some type of secondary gain from his maladaptive behaviors, particularly in the form of lawsuits against the WDOC.  Dr. Baird believed that

---

[12] Court records reflect that Goodvine has been an active litigant, with at least twelve lawsuits filed in federal district court against WDOC and WRC personnel, among others, and at least three appeals to the Seventh Circuit.  When Dr. Salter asked about the multiple lawsuits against DOC, Goodvine explained:  "I need something like that to help me.  Sometimes I have nothing to do.  I need something to do."  (Ex. # 101, at 157.)  Based on Dr. Salter's report, Goodvine's pattern of litigiousness appears to stem from a combination of pent up hostility, resentment for perceived injustices and the boredom inherent in imprisonment.

Goodvine would benefit from structured programming that incorporated boundaries, interpersonal effectiveness skills related to his personality disorder, and distress tolerance skills. According to Dr. Baird, Goodvine acknowledged that these skills have been helpful to him and demonstrated at least some insight about his behaviors.  Goodvine further appeared motivated to return to WRC for programming, demonstrated a willingness to engage in treatment, recently completed work skills and demonstrated an understanding of skills.  Dr. Baird noted that Goodvine's engagement in treatment at CCI appeared to be an avenue to "earn" a referral to WRC.

While Dr. Baird's referral to WRC was pending, PSU staff continued monitoring Goodvine and counseling him on coping skills to help him manage his destructive thoughts without resorting to self-harm.  These efforts were met with mixed success as Goodvine alternated between segregation in DS-1 and observation.

On January 5, 2011, Goodvine requested and was put in observation.  (Ex. # 101, at 27, 228.)  The unit was described as chaotic that day.  At one point, Goodvine grabbed a medication card from an officer who was distributing medication, explaining later that it was an impulsive act done "to play with" the officer.   (Ex. # 101, at 27.)  Goodvine was released from observation the following day after advising Dr. Baird that he was doing "alright."

Goodvine returned to observation on January 13, 2011, after indicating that he was feeling stressed, depressed, and anxious.  (Ex. # 101, at 30.)  He told Dr. Baird he was harboring thoughts and had developed a plan for self-harm.  In particular, Goodvine reported thinking of overdosing and had stored pills in his possession for that purpose.

(Ex. #101, at 30.)   The following day, Dr. Nelson elected to continue Goodvine's placement in observation for his own safety, advising Goodvine that he should not store up pills.  (*Id*. at 31.)

On January 18, 2011, Goodvine was again released from observation.  During his post-observation review with Dr. Baird, Goodvine told her that he was not going to tell anyone anymore when he had thoughts of harming himself because of what happened when he did -- namely, placement in observation.   (Ex. #101, at 33.)   Dr. Baird counseled that observation placement was for the purpose of safety and noted that he had successfully avoided hurting himself by alerting her to his state of mind.[13]

On February 8, 2011, Goodvine announced that he intended to embark on a "campaign of self-harm," which Dr. Baird interpreted as a "planned effort to engage in ineffective behavior" to get what he wants.  (Dkt. #101, at 34.)  In particular, Goodvine was focused on transferring to WRC and threatened to begin doing "anything he could think of" to hurt himself unless he received an answer regarding his referral by next week. Dr. Baird reminded Goodvine that his statements were contraindicated for treatment and that if he were really motivated he would look for ways to improve his own behavior rather than to engage in bargaining or "negotiating."   Acknowledging that this type of behavior could be interpreted as manipulative or a threat, because it related wholly to external gain, Goodvine relented and indicated that he no longer planned to harm himself.   Goodvine also "contracted" or agreed with Dr. Baird that he would maintain personal responsibility for his safety.  Specifically, Goodvine stated that he would notify

---

[13] Goodvine was also upset because he received a conduct report for threatening to overdose. Dr. Baird assured him that she would speak to the security director about the conduct report.

staff if he began to feel unsafe, as he had before his last observation placement; Goodvine also acknowledged that it was imperative to his treatment that he be motivated to keep himself safe.  (Ex. #101, at 34-35.)

Nevertheless, Goodvine continued to cope poorly while awaiting a response to Dr. Baird's referral to WRC.  On February 16, 2011, Dr. Baird was summoned to Goodvine's cell at his request.  (Ex. #101, at 36.)  Goodvine stated that he did not think he could "make it" the estimated three more weeks until he received notice of an upcoming step-2 review process, which apparently concerned his security classification and potential transfer from DS-1 to DS-2.  Fearing that he may get a conduct report, Goodvine denied having any intention of harming himself or needing placement in observation.  Dr. Baird noted that, once again, this contact appeared related to Goodvine's focus on access to external gain, which was evidently the primary purpose for his arguable improvement.

On February 22, 2011, Heise, as Admissions Coordinator for WRC, declined to admit Goodvine for treatment based on Dr. Baird's referral.  (Ex. #101, at 37.)  Heise determined that Goodvine's placement at WRC was not appropriate at that time after discussing his ongoing "mental health behavior management treatment plan" with WDOC staff from CCI, the Green Bay Correctional Institution, Waupun Correctional Institution and the WDOC central office in Madison.  Based on that plan, Heise believed that Goodvine's needs could be met at the WDOC facility where he currently resided (*i.e.*, CCI), and where he was already receiving coping skills instruction in preparation for the DBT program.

After his referral to WRC was denied, Goodvine's behavior worsened.  On February 25, 2011, security staff informed Dr. Baird that Goodvine was cutting himself. (Ex. #101, at 38.)  Dr. Baird observed that his wrist had been cut and was bleeding. Goodvine stated that he had cut himself on the trap door to his cell because he was feeling "anxious." Dr. Baird opined that Goodvine had chosen to self-harm as a means to solve his problem.  Despite his previous agreement with Dr. Baird, Goodvine had not reported having thoughts of self-harm before cutting himself.  Goodvine was treated at the hospital and placed in clinical observation upon his return to CCI.

Goodvine cut himself twice more on February 27, 2011, requiring trips to the emergency room.  (Ex. #101, at 39.)  Goodvine had reportedly told a staff member that he needed to be restrained before leaving for the hospital to receive treatment that evening.  A security supervisor notified Dr. Baird when Goodvine returned from the hospital and full-bed restraints were authorized as Goodvine had exhibited behavior that evidenced on-going instability and unwillingness to behave in a safe manner. Goodvine was released from observation into full-bed restraints due to the severity of the harm and his attempts to conceal self-harm.  (Ex. #101, at 40-41.)

After being released from the full-bed restraints on February 28, 2011, Goodvine was returned to observation status but continued to prove a difficult patient.  On March 8, 2011, Dr. Baird met with Goodvine at length during an out-of-cell consultation to discuss some concerns he had raised in a letter the previous day.  (Ex. #101, at 42.) Specifically, Goodvine stated that he was no longer going to be eating, despite telling Dr.

Baird he would when in observation status.  In his letter, Goodvine further acknowledged telling Baird this, while actually planning to continue his hunger strike.

When confronted with his dishonesty, Goodvine explained that he had changed his mind about his promise after receiving some unexpected conduct reports and restrictions the previous night.  Dr. Baird noted that Goodvine's behavior appeared "planful and willful," continuing to demonstrate that staff could not trust him.

During his March 8 meeting with Dr. Baird, Goodvine also expressed anger about staff reaction to his multiple cuttings on February 27, as well as the failure of security to communicate with PSU staff about his problems and statements of self-harm.  (Ex. #101, at 42.)  When Goodvine asked whether Dr. Baird was notified of his statements of intent to self-harm, Dr. Baird informed him that no advance notification was provided and that this was likely due to the fact that Goodvine was already in observation status.

Dr. Baird also discussed with Goodvine his request for a "protocol" for "therapeutic restraints."  (Ex. #101, at 42.)  Goodvine wanted to have the authority to determine what type of restraint was necessary (*e.g.*, chair or bed restraints).  Should a protocol be put in place for the use of therapeutic restraints, Dr. Baird explained that Goodvine would not be given the authority to choose his own restraints for a variety of reasons related to the clinically/medically indicated duration of different restraint options, as well as the necessity for clinical/medical service professionals to assess this need.  Attempting to engage Goodvine in a conversation about safety, Dr. Baird reminded Goodvine that he had to care about his own safety as much as clinical staff did in order for anyone to be able to assist him in keeping himself safe.  Dr. Baird reminded

Goodvine of recent times in which he had misled her about his safety and failed to uphold his safety plan.  She discussed how his dishonesty adversely affected their clinical relationship, trust, ongoing treatment interactions and safety assessments.  Dr. Baird explained to Goodvine that it would be difficult or impossible to guess his current safety status if he failed to report any problems to staff, emphasizing that was his responsibility as he appears to be externalizing "blame" for his recent behavior that, by his own indication, appear to have been "planful acts of self-harm."

Goodvine was offered an appointment on March 21, 2011, to address his hunger strike, but Goodvine refused the appointment.  (Ex. #101, at 44.)  Although he was seen for a psychiatry appointment on March 30, 2011, he again refused to speak with Dr. Baird.  (Ex. #101, at 44.)

During Dr. Baird's routine clinical rounds on April 5, 2011, Goodvine asked to be seen immediately and reported that it was an "emergency."  (Ex. #101, at 46.)  In the ensuing discussion, Goodvine (1) noted that there had been a "step-down" meeting with the administrative captain and (2) wanted to be on a "no razor restriction" when he moved from DS-1 to DS-2.  Dr. Baird agreed that the restriction appeared warranted and observed further that Goodvine appeared to be taking a proactive approach to remaining safe as he progressed through the step process.  Goodvine denied feeling "self-harmful" at that time, stating that although the urge to hurt himself was "always" present to some degree, it was not then strong.

During this April 5 discussion, Goodvine again asked Dr. Baird about a protocol for being preemptively placed in restraints.  After a brief discussion, Goodvine was once

again informed that this type of protocol did not exist at the time. Dr. Baird discussed the importance for Goodvine to practice bolstering coping skills to better manage distress as it came up, as well as how restraints could potentially interfere with this goal if applied unnecessarily. Dr. Baird also noted that Goodvine's mental health code had changed, reflecting designations of both MH-1 and MH-2b, as the result of further discussion with PSU staff regarding the recent increase in behavioral symptoms associated with his personality disorder.

On April 6, 2011, Goodvine was seen individually out of his cell by Dr. Baird and Dr. Schwebke to discuss his ongoing treatment plan. (Ex. #101, at 47-48.) Dr. Schwebke began by discussing Goodvine's request for a more specific restraint protocol. Dr. Schwebke shared Bair's concerns with utilizing restraints too liberally, which could interfere with the development and use of coping skills when exposed to uncomfortable experiences. Dr. Schwebke discussed the importance of brief exposure and an incremental process of evaluation and intervention. Dr. Baird also discussed the importance of honesty in this type of evaluation and talked about situations in which Goodvine had not engaged honestly in safety assessments, making it more difficult or impossible to assist him in remaining safe.

Goodvine reportedly acknowledged a few periods in which he had been dishonest with PSU staff about his safety and access to potentially harmful items. Dr. Baird also pointed out times in which Goodvine had been able to redirect himself and utilize coping strategies to effectively manage emotions, even during periods of time in which he initially seemed resigned to engaging in self-harm. Dr. Baird encouraged Goodvine to

take self-harm off the table in order to engage in treatment fully and in the process of accessing alternative methods of coping with his distress.   Dr. Baird explained how retaining the idea of self-harm as an option for coping with his problems would likely impede his growth in these areas because he could always default to utilizing these less adaptive methods when other methods seemed to be challenging.   Dr. Schwebke discussed Goodvine's use of self-harm and restrictive eating patterns as having a variety of functions, including drawing external attention to his problems and also periods of emotional instability and problematic ways of thinking about himself.

On April 22, 2011, Drs. Baird and Schwebke again met with Goodvine following his step-down placement in DS-2.   (Ex. #101, at 49.)   They observed that Goodvine appeared to be doing better in terms of his emotional adjustment to the unit.   He had been on the DS-2 unit for about a week and was coping adequately.   Goodvine discussed some of his recent thoughts and feelings, including how the scars he incurred from his past attempts at self-harm have influenced his thoughts, feelings and urges.   In particular, Goodvine felt some sense of anxiety about his responses to other peers who might inquire about the scars and his general well-being.   Drs. Schwebke and Baird discussed those thoughts and feelings in more detail, as well as different strategies to cope.   At that time, Goodvine had been able to wear long sleeve shirts to cover his scars and felt more comfortable by not having them revealed to both himself and others.

In terms of a program to address Goodvine's self-harm going forward, PSU staff, in consultation from Dr. Ankarlo, added some additional precautionary elements, including the option of a "direct vigil" while he was in observation under certain

circumstances. Goodvine seemed pleased with this plan as a way to assist him in feeling more secure.  Goodvine also learned that Dr. Schwebke would be primarily seeing him for treatment purposes in the future and that he planned to refer Goodvine to the "Personality Disorder Group" at WRC in the future, while Dr. Baird would continue to assist with any additional coaching on DBT skills as needed.  Dr. Schwebke noted that Goodvine had been making an adequate adjustment to the DS-2 unit and coping appropriately.  During Goodvine's transition from DS-1 to DS-2, PSU staff had also shared with him some information and material on mindfulness, anger control/management and nutrition.

On May 2, 2011, Goodvine was on track for release from segregation into the general population at CCI.  (Ex. #101, at 50.)  PSU staff continued to monitor him and provide him with materials on coping skills and mindfulness.  (Ex. #101, at 51.)

On May 24, 2011, Goodvine met with Dr. Baird and members of the WRC outreach team.  (Ex. #101, at 52.)  Dr. Baird initiated this discussion for the purpose of a preliminary interview and assessment of Goodvine's motivation for potential ongoing treatment at WRC when the personality disorder program was developed.  A member of the outreach team discussed the way in which the program would be structured, the timeline, and likely expectations for completion and participation.  Goodvine agreed that he would complete "new freedom materials" independently if they were sent to him and WRC would plan to follow up with him again in the future.

On June 7, 2011, Dr. Nelson met with Goodvine, following his release from segregation and transfer back into the general population at CCI.  (Ex. #101, at 53.)  Dr.

Nelson noted that Goodvine seemed to be doing "pretty well" and was getting along with others on his unit.   Goodvine asked about his referral to WRC for the personality disorder program; Dr. Nelson told him she would follow up.   In the meantime, Goodvine continued to be followed by psychiatry for purposes of monitoring his medication and PSU staff members.  (Ex. #101, at 53-55.)

On July 25, 2011, Goodvine met with Dr. Baird, who noted that Goodvine was on another hunger strike.  (Ex. #101, at 56.)  Goodvine had met with his lawyer earlier that day and expressed frustration regarding how his legal calls were being handled by the unit social worker. He was encouraged to write to the unit social worker and/or unit manager about this and Dr. Baird followed up with the unit manager.   Dr. Baird attempted to redirect the discussion to managing his distress regarding the current situation and Goodvine continued to request that Dr. Baird assist him in remedying the situation. Goodvine also inquired about an assessment that was being requested in conjunction with his referral at WRC.   Goodvine asked whether he could be given clinical authorization to take his meals in his cell because he reportedly felt anxious eating in the dayroom with other inmates.   Dr. Baird advised Goodvine that continued avoidance of this anxiety could exacerbate the issue further, but agreed to consult with the other PSU staff about the requested authorization as this was typically a group decision.

During an out-of-cell meeting on August 11, 2011, Goodvine reported feeling "restless" because he had not gotten any answers about his potential referral to WRC. (Ex. #101, at 58.)  Dr. Baird briefly discussed this with Goodvine and explained some of the reasons for the delays, but also encouraged him to use coping skills to tolerate the

distress.   Goodvine was applying for jobs and believed that a position in the kitchen looked promising.  He had also applied to take part in an educational program at CCI, although he reported having an unsatisfactory interaction with the teacher, who he believed was being unfair to him.   Dr. Baird discussed appropriate social skills, interpersonal effectiveness skills and a way to approach the teacher by inviting her to have a conversation with him about his concerns.

On September 8, 2011, Dr. Baird met with Goodvine out of his cell.  (Ex. #101, at 60.)  Goodvine reported feeling "restless" and "sick of the same routine."  Goodvine reported attending an anger management class and going to school "to keep himself sharp."   Goodvine further reported that the night before he thought about hurting himself and going to observation, but denied having an intention to harm himself at that time and stated that the thoughts of self-harm were only in the "periphery of his mind." Goodvine reported that he spent much of his time exercising, studying and reading and acknowledged that he was currently working with another PSU staff member (Dr. Trinidad) on identifying and modifying irrational thinking.  Dr. Baird inquired how Goodvine thought that applied to the current situation and engaged him in a discussion about mindfulness, recognizing that he frequently reacted to situations that may potentially occur in the future, rather than remaining "in the moment" and responding to the current situation and context.   When Goodvine commented that he believed something "bad" was going to happen, Dr. Baird discussed ways that this thought could become a "self-fulfilling prophecy."   Dr. Baird engaged him in a discussion about thought-stopping activities and this was practiced. She also encouraged Goodvine to

"build purposeful structure and mastery" into his routine by engaging in activities with an identified goal and purpose in mind.

Three weeks later, on September 29, 2011, Goodvine attacked another inmate, stabbing him several times with a weapon made of pencils.  As a result of this incident, Goodvine returned to segregation status in DS-1.  This dramatic setback also set off a chain of four incidents of self-harm during the month of October 2011.  Those incidents are summarized in more detail below and form the principal basis for the pending lawsuit.


SPECIFIC INCIDENTS OF SELF-HARM IN OCTOBER 2011

I.   **Incident of Self-Harm on October 1**

On September 29, 2011, Dr. Kumke saw Goodvine at his cell door for a clinical evaluation following the attack on another inmate that resulted in Goodvine's placement in DS-1.  Goodvine reported that he was on a hunger strike because he "want[ed] to die." Goodvine also expressed fear that:   (1) he was going to be stuck in "security" or segregation status, and unable to extricate himself; and (2) he might at some point go back to cutting himself like he had in the past, although he denied thinking of cutting himself at that time.  Dr. Kumke encouraged Goodvine, noting that he had been able to be in the general population and could get himself out of segregation again. Goodvine requested to be placed in a cell in the back area of DS-1 because he would feel "safer" there.  Kumke consulted security staff, but apparently there were no cells available in the back area.

During their discussion on September 29, Goodvine reportedly told Kumke that he was hearing negative voices and feeling very hopeless. (Dkt. #236, at ¶ 115.) Goodvine asked to be put in observation for his own safety. (*Id*. at ¶ 117.)   On evaluation, however, Kumke found that Goodvine was not in imminent threat of self-harm and decided not to place him in observation status at that time. (*See* Ex. #101, at 62.)   Based on this evaluation, Kumke made a plan to have PSU staff check in with Goodvine the next day to reassess how he was doing. (*See id*.)

Drs. Nelson and McLaren followed up with Goodvine the following day on September 30, 2011.  By that time, Goodvine reported that he had not eaten or taken any liquids in two days, but accepted responsibility for the behavior that resulted in his placement in segregation (attacking another inmate) and felt upset and disappointed about being in segregation again.  Drs. Nelson and McLaren drew upon Goodvine's past experience in general population as evidence of progress.  They encouraged him to use the coping skills he had applied in order to leave segregation previously and maintain general-population status as he faced this new challenge.  Goodvine admitted that he had thoughts of cutting himself recently, but had chosen to sleep instead as a way to cope. Drs. Nelson and McLaren gave Goodvine some books to help him occupy his time and noted that he appeared amenable to refraining from self-harm.  Nelson and McLaren notified unit staff, the shift supervisor, and HSU of Goodvine's continued refusal of food and liquids. (*See* Ex. # 101, at 63.)

At approximately 6:31 p.m. on October 1, 2011, security staff working in the DS-1 unit requested assistance after noting that Goodvine had cut himself and smeared

blood on his cell window.  (Incident Report #15608.)  When additional officers arrived, Goodvine was removed from his cell and placed in restraints.  At that time, officers recovered two pieces of metal that Goodvine had hidden in his hair.  At approximately 7:00 p.m., Goodvine was transported to the local hospital (Divine Savior Hospital in Portage) for sutures.  He returned to CCI later that evening at around 9:30 p.m. and was placed in observation status.   Goodvine claims that he asked Sergeant Schneider to contact PSU staff so that he could be put in observation status before cutting himself, but that Schneider ignored him and did nothing to prevent harm.

## II.    Incident of Self-Harm on October 5

Following the October 1 incident, Goodvine was placed in observation in DS-1. On October 3, Dr. McLaren met with Goodvine to review his observation placement. Goodvine denied having current thoughts of self-harm, but said that his placement in observation was "no good," that he had "nothing to look forward to," and that he "needs a change of environment."  Dr. McLaren agreed to check on Goodvine's referral to WRC and update him the next day.  When Goodvine requested a blanket, McLaren informed him that if he was able to demonstrate "behavioral stability" and no further intent to self-harm, she would revisit the blanket issue with him in the morning. On examination, Dr. McLaren noted that Goodvine's eye contact was poor and his affect was depressed. Based on her evaluation, McLaren continued Goodvine's observation placement due to his recent behavior and his continued appearance of being depressed. (*See* Ex. #101, at 00066.)

Dr. McLaren met with Goodvine again on October 4 to review his placement in observation.  She noted that Goodvine continued to refuse food and liquids, at least according to DS-1 security staff.  Goodvine repeated his request for a security blanket, stating that he no longer had thoughts of self-harm.  Goodvine reportedly informed McLaren that he would use his coping skills to manage distress if he were released from observation and then noted that the lack of sleep that he had been experiencing while in observation would "lead to a breakdown." When Goodvine inquired about his referral to WRC, McLaren informed him that he would not be going to WRC due to his recent battery of another inmate. (*See* Ex. #101, at 00067.)   After consulting with another doctor, McLaren approved a security blanket for Goodvine.   She also continued Goodvine's observation placement based on his recent episode of self-harm and his difficulty in demonstrating emotional and behavioral stability.  (*See id.*)

On October 5, 2011, Dr. McLaren met with Goodvine at his cell front for review of his observation status.  At that time, she noted that Goodvine appeared depressed and withdrawn.  His gaze was primarily directed at the floor and his voice was extremely soft. Goodvine reported that he continued to refuse food and liquids. When McLaren asked him how he felt, Goodvine stated, "I just want to die" and "I want to kill myself" numerous times.  McLaren made emphatic statements regarding Goodvine's situation, and brought up his ability to cope with setbacks, but Goodvine made no further statements. (*See* Ex. #101, at 00068.)   Based on this evaluation and Goodvine's continued expression of a desire to harm himself, Dr. McLaren maintained Goodvine's observation status.  (*See id.*)

After Goodvine stated that he was going to force them to take him to the hospital "because he was bored," security staff conducted a search of his cell.  (Incident Report, #15862.)  Nothing was found.  At approximately 1:55 p.m. on October 5, Goodvine was nevertheless able to cut his left wrist.  (Incident Report, #15952.)  As a result, Goodvine was escorted to Divine Savior Hospital for sutures.   Goodvine claims that he told defendant Officer Wiley and defendant Officer Millonig that he was having thoughts of self-harm before he cut himself, but that neither officer contacted PSU or a supervisory officer on his behalf.

## III.    Incident of Self-Harm on October 12

In the days leading up to the October 12 incident, Goodvine was evaluated on a daily basis by Dr. Kumke.  Dr. Kumke had checked on Goodvine after he returned from the hospital on October 5, 2011.  (Ex. #101, at 69.)  At that time, Goodvine reported that he was feeling better, although he felt slightly nauseous.   Dr. Kumke noted that Goodvine did not appear agitated and denied any current thoughts of self-harm. Based on his evaluation and Goodvine's actions that day, Dr. Kumke found that Goodvine remained at risk for self-harm and continued him in observation status. (*See* Ex. #101, at 69.)

Dr. Kumke met with Goodvine again the following day on October 6.  At that time, Drs. Kumke and Johnson reviewed Goodvine's placement in observation status given his statements about going to the hospital because he was bored. Goodvine complained that he was feeling depressed and needed to be released from observation

status before the weekend.  Goodvine stated that he "[couldn't] stay in here over the weekend," and that he "would not do anything stupid" if he were released from observation the next day.  When asked if he would make it through the weekend without engaging in any self-harm, Goodvine replied that he was positive he would. Goodvine was informed that he would be seen the next day for re-evaluation and was encouraged to refrain from any self-harm behaviors. (*See* Ex. #101, at 71.)  Drs. Kumke and Johnson still elected to continue Goodvine in observation status as a precaution based on their evaluation and his recent actions of self-harm.

On October 8, Dr. Kumke met with Goodvine at his cell door for clinical follow-up upon his release from observation.  Goodvine reported that he was doing "OK" and denied having any thoughts of self-harm.  Since Goodvine was feeling a little restless about his WRC referral, Kumke reminded him that this issue would be discussed with Dr. Ankarlo.  Goodvine also complained about being on a pen/pencil restriction.  Kumke informed Goodvine that this was done as a precaution, and since he was not having any difficulty, Kumke authorized the pen/pencil restriction to be removed.  (*See* Ex. #101, at 74.)

On evaluation, Kumke found Goodvine was alert and oriented.  His eye contact was appropriate and his speech was normal.  Goodvine's mood was euthymic or positive, and his affect was normal and appropriately changing with the content of the discussion. Goodvine's thought processes were also organized and goal directed.  He specifically denied any thoughts of self-harm and was future oriented.  Based on this evaluation,

Kumke maintained Goodvine's current diagnosis and mental health code, and made a plan to follow-up. (*See* Ex. #101, at 74.)

On October 10, Kumke saw Goodvine for an out-of-cell clinical contact on DS-1, after Goodvine had written a request to be seen, stating that he was having "crazy, racing thoughts." Goodvine reported that he was "not doing too good" and still had thoughts of cutting himself, but denied any intention to act on them. Goodvine again informed Dr. Kumke that he had no plans to hurt himself, and that he would let someone know if he were to have such thoughts. Goodvine stated that he is "trying to maintain," and asked for a "change of environment." Since Goodvine also stated that he did not think he would "make it here," it was suggested that he write to (1) the Security Director with his request and reasons for the change of placement and (2) the HSU psychiatrist about his medication, to see if that might be one way of helping him with his racing thoughts.

Ultimately, Dr. Kumke explained that Goodvine would not be able to go to WRC at that time, although there might be a possibility sometime in the future. Goodvine then reported that he felt "tired of trying to cope," "tired of doing the right thing" and "tired of working on this stuff." Kumke talked with Goodvine about how to break his cycle of negative behaviors, focusing on the negative self-talk that he engaged in. Goodvine was taught a "defusion [sic] technique (the hand-turning technique)" to help him notice and separate from his negative thoughts. When Goodvine stated that he would stop eating and drinking, Kumke discussed with him the self-defeating nature of this. Kumke also gave Goodvine a chapter to read on "self-talk" for homework. (*See* Exh. #101, at 75.)

Kumke noted that Goodvine was alert and oriented during the session. His eye contact was appropriate and his speech was normal. Goodvine reported his mood as dysphoric and his affect was slightly depressed, but denied any intention of harming himself, stating specifically that he did have thoughts of cutting.   Kumke found that Goodvine's thought processes were organized, goal directed and future oriented.   Based on this evaluation, Kumke maintained Goodvine's current diagnosis and made a plan to follow-up. (*See* Ex. #101, at 75.)

Dr. Kumke met again with Goodvine at his cell door on DS-1 on October 12, after Goodvine had written a letter to Warden Meisner stating he was neither eating nor drinking, and that he planned to kill himself.   Goodvine explained that he wrote that note over the weekend and that, while he was having thoughts of self-harm, he had no plans or urges to act on them at the time.   Goodvine also reportedly stated that he was not currently feeling like killing himself and was trying to work on coping skills.   Dr. Kumke noted that Goodvine was not eating and drinking, and attempted to discourage him again from taking this course of action, but Goodvine reported that he felt like he did not have control over his life and that he wanted to "cut ties with everyone." Goodvine reported that he was "trying to maintain," but felt trapped and as though no one took him seriously.   Goodvine asked again to be sent to another institution, and asked Kumke to "campaign" for him.   Kumke reminded Goodvine that a unit transfer would be an administrative or security decision, not a PSU decision.   Kumke pointed out Goodvine's negative thinking pattern and attempted to challenge some of his thinking.

Kumke also encouraged him to continue using adaptive coping skills to help him deal with his negative emotions.  (*See* Ex. #101, at 76.)

In evaluating Goodvine on October 12, Kumke again found that he was alert and oriented. His eye contact was appropriate and his speech was normal.  Although Goodvine's mood was dysphoric (depressed), his affect appeared to be within the normal range and his thought process was organized, goal directed and future oriented. Goodvine admitted having thoughts of self-harm, but denied any intention to act on those thoughts.  Based on this evaluation, Kumke maintained Goodvine's current diagnosis and made a plan to continue regular monitoring and to respond to any of his requests.  (See Ex. #101, at 76.)

At approximately 6:20 p.m. on October 12, however, security staff reported that Goodvine and another prisoner had cut themselves while housed in the regular tier of the DS-1 unit.  (Incident Report #16684.)  According to the incident report, Goodvine and another prisoner appear to have orchestrated a collaborative effort to hurt themselves simultaneously to see how staff would react.  Although his injury was not life-threatening, Goodvine was taken to Divine Savior Hospital and treated for lacerations on his right arm.  He returned to DS-1 that same night and was placed in observation status. Goodvine claims that he told defendant Officer Julson that he was having thoughts of self-harm and that he was suicidal before cutting himself, but that Julson did not alert PSU staff or do anything else to prevent harm.

## IV.     Incident of Self-Harm on October 13

On October 13, Goodvine remained in observation, having cut himself the day before.  Early that morning, Dr. Johnson checked on Goodvine in his cell to evaluate his placement in observation.   Goodvine was sleeping, however, and did not respond. Sometime thereafter, Goodvine claims that he told a correctional officer (defendant Wiley) that he wanted to cut himself again.  Wiley reportedly informed another officer (defendant Conroy), who told Goodvine that he would not be seen by PSU until the next day because he had "ignored" Dr. Johnson's earlier visit.  Goodvine pleaded with Conroy for a consultation, or for someone to place him in restraints, but Conroy reportedly refused.  Goodvine claims that he then told Officer Wiley about Conroy's inaction, but that Wiley also refused to alert PSU or a supervisory officer.

At approximately 3:50 p.m., Goodvine informed a member of security staff that he had cut open an old scar on his left upper forearm.   (Incident Report #16806.) Goodvine told the officer that he used the trap door of his cell to cut himself because he wanted to speak to clinical personnel from PSU.  (*Id*.)  Goodvine was placed in restraints, strip-searched and taken to Divine Savior Hospital for sutures.  He returned to CCI later that evening and was retained in observation status.


GOODVINE'S TREATMENT
FROM OCTOBER 2011 THROUGH JULY 2012

PSU staff at CCI continued to monitor Goodvine's mental health while he was in segregation through the end of 2011.  Goodvine continued to struggle, threatening to overdose on hoarded medication on December 5 (Incident Report # 21733) and cutting

himself again on December 6 (Incident Report # 21657).  As he stabilized, PSU staff began to consider making another referral for mental health treatment at WRC.

On January 24, 2012, Goodvine was seen by Dr. Schwebke for an out-of-cell consultation.  During the interview, Dr. Schwebke discussed coping strategies, positive self-talk, and ways that Goodvine could challenge his negative thinking patterns.  (Ex. #101, at 83.)  Dr. Schwebke also discussed the possibility of a referral to WRC for the "Coping Skills" program.  Based on his evaluation, Dr. Schwebke made a plan to continue clinical monitoring.

On February 9, 2012, Goodvine submitted a PSR for an out of cell clinical contact, threatening suicide if his meals were not changed to a "kosher" diet.  (Ex. #101, at 84.)  Based on this incident, Dr. Laurent made a plan to continue clinical monitoring and to present Goodvine's case to a "Multi-institution Planning Meeting" to facilitate his continued treatment.  (Ex. #101, at 85.)

Goodvine refused an out-of-cell meeting with Dr. Harris on March 5, 2012.  (Ex. #101, at 86.)  When she met with him for clinical monitoring at his cell front, Goodvine told Harris that he consistently had thoughts of self-harm, but did not currently have any plan or desire to hurt himself.  Dr. Harris encouraged him to notify staff immediately and to seek PSU services if that should change.

On March 7, Goodvine held up a hand full of pills and told a security officer doing rounds that he intended to ingest them unless he was able to see a psychologist right away.  (Dkt. #101, at 93.)  When interviewed by Dr. Buhr, Goodvine explained that he believed two officers were trying to kill him by allowing him to accumulate quantities of

43

medication.  (Ex. #101, at 88.)   Still, Goodvine denied having suicidal thoughts and stated that he was "not going to hurt [himself]," but that there was "no telling when [he] would get the urge."  (*Id.*)   As a result of this incident, Goodvine was placed on observation status with close monitoring.  (*Id.*)

On March 8, Dr. Laurent released Goodvine from observation after he indicated that he had no suicidal ideation, intent or plans and he agreed to let staff know if he was feeling unsafe.  (Ex. #101, at 89.)   By virtue of his antisocial personality disorder diagnosis, Dr. Laurent observed that Goodvine "tends to get satisfaction from showing any weaknesses or deficiencies in 'the system' since he finds authority to be challenging." (Dkt. #101, at 93.)   She noted further that he was "likely to turn his anger and aggression inwards through self-harm or attempt to use his intellect to get to those in positions of authority."   In that respect, Goodvine "glean[ed] pleasure from the pursuit of outsmarting staff when he [could] find a weakness in protocol."

On March 9, Dr. Buhr met with Goodvine for a post-observation placement review.   During that session, Goodvine reported that he was doing better and was not going to "do anything" to harm himself.  (Ex. #101, at 90.)   Although Goodvine indicated that he felt pressure from security staff, who he believed were pressuring him to commit suicide, he also stated that getting pulled out of his cell to talk with clinical personnel was helpful and that a focus on DBT skills, challenging negative thoughts, and Socratic thinking had proven the most helpful to him in the past.   Dr. Buhr advised Goodvine that PSU staff would work with him on continuing these successful strategies.

Goodvine met with Dr. Harris on March 12 to discuss his depression.  (Ex. #101, at 91.)  Goodvine mentioned that his current medication (Seroquel) helped, but also indicated that his self-harm behaviors, specifically cutting, helped to "relieve stress."  Dr. Harris prompted him to consider positive behaviors that could help relieve stress as well and they discussed the importance of positive thinking. When Goodvine expressed concern that officers were not watching him take his medication, Dr. Harris reminded Goodvine that it was his choice whether or not to misuse his medication.

On March 20, Dr. Laurent advised Goodvine that he was under consideration for a referral to the WRC.  (Ex. #101, at 92.)  Dr. Laurent and Goodvine discussed a "behavioral contract" as a means for him to demonstrate that he was motivated to participate in programming at the WRC facility.  Goodvine was asked for input and agreed that it would be reasonable to include in his contract:  (1) behaviors such as refraining from self-harm (including no hunger strikes), (2) not acquiring any major conduct reports, and (3) completing any assigned homework or outside of session activities.  Dr. Laurent also noted Goodvine continued to have "fairly consistent thoughts of self-harm," but that he "denied any plan or intent to engage in self-harm behaviours [and he] was prompted to notify staff immediately if such should change."  Goodvine continued to work with Dr. Harris on "Basic Emotion Regulation Skills" and "Basic Distress Tolerance Skills" to better cope with his circumstances.

On March 27, Dr. Harris met with Goodvine, who reported feeling "persecuted" and "depressed" because he continued to receive conduct reports, including a recent report for lying about staff.  (Ex. #101, at 94.)  Goodvine disclosed on one of his

worksheets that he cut himself with a paperclip and began devising ways to kill himself before disposing of the paperclip.  Dr. Harris reminded him of his behavioral contract for treatment at WRC and counseled him about his tendency to use self-harm as a manipulative behavior.  Goodvine disagreed that he was manipulative, but seemed to understand how others could see his self-harming behavior as manipulative.  Goodvine was told that he needed to accumulate at least six weeks of good behavior to earn a referral to WRC.

On April 2, 2012, Dr. Harris noted that Goodvine had received a major conduct report for making threats and that he was in violation of the behavioral contract.  She discussed with Goodvine his need to demonstrate self-control by using coping skills and assisted him in completing a "Big-Picture Evidence Log" from his Basic Emotion Regulation Skills packet.  According to Dr. Harris, Goodvine struggled with evidence to contradict his thinking and feeling.  (Ex. #101, at 95-96.)  Goodvine was provided with additional Skills Training and he was given five additional Big-Picture Evidence Logs to complete.  (Ex. #101, at 95-96.)

During a clinical consultation with Dr. Harris on April 9, Goodvine acknowledged that his behavioral contract for WRC continued to be in place and denied engaging in any self-harm or receiving any recent conduct reports.  (Ex. #101, at 97-98.)  On April 16, Dr. Harris noted that Goodvine continued to comply with the terms of his behavioral contract for treatment at WRC by demonstrating an ability to control and regulate his emotions and behaviors when he chooses.  (Ex. #101, at 99.)  Therefore, Dr. Harris prepared a referral for his placement at WRC.  Goodvine was also referred to the Coping

Skills Program on "High Management" or "segregation unit" at WRC (also denominated in the record as "Coping Skills in Segregation").[14]  (Dkt. #83, Ex. at 8.)

In making her referral, Dr. Harris noted that Goodvine had a tendency to feel easily wronged by others and admitted that he had frequently sought retaliation, historically through either harming others, himself, or through litigation and complaints. Dr. Harris opined that symptoms of Goodvine's antisocial personality disorder included deceitfulness, impulsivity, irritability, recklessness, and at times lack of remorse.  Dr. Harris noted that Goodvine also demonstrated a pattern of entitlement, arrogance, exploitation, frequently made threats to harm himself, including the use of extended hunger strikes, and occasional impulsive, self-harm behaviors.

Dr. Harris noted that Goodvine's primary treatment issues appeared to relate to his principle diagnosis of antisocial personality disorder, particularly as it pertains to interactions with others. Goodvine was often ineffective during interactions with authority figures and becomes easily agitated, irritated, and may act impulsively. These issues, at times, appeared to be exacerbated by his diagnosed mood disorder, particularly during periods of increased depression or irritability and there often appeared to be some

---

[14] The Coping Skills Program is described as a four-week program that addresses five clinical areas:  (1) anger control; (2) assertiveness; (3) self-awareness of an individual's behavior, the significance of the behavior, and potential consequences for the behavior; (4) anxiety and frustration tolerance; and (5) application of coping strategies learned throughout the program.  Conducted in small-group format, the purpose of the program is to offer the inmate new ways of managing problem situations.  Upon completion of the program, the individual would be expected to identify and utilize adaptive coping strategies when experiencing setbacks and disappointments.  Consequently, they would be less likely to experience intense distress, harm themselves, or harm others.

type of secondary gain from his maladaptive behaviors, particularly in the form of lawsuits against the DOC.

Dr. Harris observed that Goodvine had been seen frequently for individual appointments by PSU staff and was participating in focused, individual appointments with her while in segregation that centered on distress tolerance, emotion regulation and interpersonal effectiveness. Over the course of several weeks, Goodvine had completed in-cell work intended to assist him in applying these skills in his daily life and was able to discuss the skills learned during individual sessions.   Although Goodvine had not demonstrated mood stability recently, continually reported thoughts of self-harm and at times engaged in impulsive self-harm behaviors, Dr. Harris further stated that Goodvine wanted the opportunity to participate in programming at WRC.  Dr. Harris found that Goodvine appeared motivated to receive further treatment and had shown his commitment by recently refraining from self-harm behaviors, including no hunger strikes, not acquiring any major conduct reports, and completing any assigned homework or outside of session activities.

While Dr. Harris reviewed the referral to WRC with Goodvine on April 23, 2012, Goodvine became upset and abruptly ended a clinical contact.  In particular, Goodvine was upset that the referral discussed his pattern of litigation against WDOC as indicating an exacerbation related to his personality disorder.  After he was escorted back to his cell, Goodvine threatened to cut himself if he was not able to speak with Dr. Laurent.  (Ex. #101, at 101-02.)  As a result, Goodvine was placed in observation status.  Dr. Laurent followed up with Goodvine that same day in an attempt to de-escalate the situation for

everyone's safety.  (Ex. #101, at 100.)  She noted Goodvine's tendency to engage in "staff-splitting" (presumably, between PSU and security staff) and to issue ultimatums.

Notwithstanding Goodvine's belligerent behavior, Dr. Harris submitted the referral for Goodvine's placement at WRC on April 24, 2012.  (Ex. #101, at 103-05.) On April 26 and 27, Goodvine was seen by Dr. Laurent for clinical monitoring.  During these visits, Goodvine expressed impatience and frustration at having to wait for a reply from WRC, but reported that he had no current suicidal ideation, intent or plan.  (Ex. #101, at 106-07.)  Dr. Laurent discussed with Goodvine ways in which he could occupy his thoughts while waiting to hear back from WRC about Dr. Harris's referral.

On May 1, 2012, Dr. Harris met with Goodvine for a clinical consultation.  (Ex. #101, at 108.)  During that session, she confronted Goodvine with his ability to speak and write about coping skills, but his inability to use them.  She noted that Goodvine continued to engage in manipulative behaviors and efforts to divide staff by refusing to adhere to the proper chain of command.  Dr. Harris noted further that Goodvine consistently threatened self-harm or demanded to speak with Dr. Laurent when his requests were not met.  In that regard, Dr. Harris noted that Goodvine was "capable of managing adequately," but that he chose not to do so.  Dr. Harris planned to continue to address these behaviors, which she viewed as an extension of his personality disorder, in future sessions.

After meeting with Dr. Harris on May 1, 2012, Goodvine returned to his cell only to become upset that it had been searched.  (Ex. #101, at 110.)  When Goodvine requested placement in observation, Dr. Harris was called to DS-1 to meet with him.

Expressing his frustration over the search, Goodvine covered his cell window with a towel and threatened to take a handful of pills. Security personnel were able to get Goodvine to surrender the handful of pills and he was placed in observation.

Dr. Schwebke followed up with Goodvine the following day, on May 2. (Ex. #101, at 111.) Based on his evaluation that day, Dr. Schwebke found that Goodvine continued to present a threat to harm himself and retained him in observation status. On May 3, Dr. Harris released Goodvine from observation status after review, noting that Goodvine denied thoughts and intent to self-harm and contracted for his safety. (*See* Ex. #101, at 112.) Goodvine received follow-up contacts by Dr. Schwebke, Dr. Harris and Dr. Laurent during the month of May. (*See* Ex. #101, at 113-16.) During this time, Goodvine denied having thoughts or plans of self-harm.

On May 29, Heise approved Goodvine for mental health placement at WRC, noting that he appeared appropriate for temporary placement at WRC for Coping Skills on Segregation. (Ex. #101, at 118.) Dr. Harris continued to meet with Goodvine in June of 2012, while he awaited transfer to WRC. Goodvine was also seen for clinical monitoring by Dr. Laurent.

On June 13, Goodvine cut himself on the wrist after he was removed from the recreation list for disobeying orders to uncover his cell window. (Ex. #101, at 123.) The cut was not deep and was not bleeding when examined by a PSU staff member.[15] Goodvine was encouraged to think about his plans following his release from prison and reminded that he could look forward to placement at the WRC in the near future.

---

[15] While the cut was disinfected, it is unclear what, if any, other treatment Goodvine required on this occasion.

Goodvine was also reminded that he needed to let staff know if he was having any urges to cut himself.  Goodvine's mood appeared to improve and he denied having such urges. Still, Goodvine continued to act out and challenge his treatment providers while awaiting his transfer to WRC.  When Dr. Harris attempted to visit him on June 19, Goodvine greeted her with a string of profanity and other inappropriate comments.  (Ex. #101, at 124.)  After he continued to yell and bang on his cell door, Dr. Harris left.

On June 28, Dr. Caldwell-Barr met with Goodvine at his request.  (Ex. #101, at 125.)  Goodvine reported "getting anxious" about his upcoming placement at the WRC. Although he was "trying to chill," Goodvine also reported having thoughts of self-harm. Dr. Caldwell-Barr reviewed with Goodvine coping strategies, such as keeping himself preoccupied to divert his attention away from self-harming thoughts.  Goodvine acknowledged that going to WRC offered an incentive to stay out of observation placement and denied having any current suicidal intent or plan.  Based on her evaluation, Dr. Caldwell-Barr elected to continue a treatment plan of routine, clinical monitoring.

On July 13, Dr. Buhr met with Goodvine for clinical monitoring at his request.  At that time, Goodvine was upset that he had not yet been sent to the WRC.  Goodvine wanted to know when he would be sent to WRC for treatment.  Buhr stated that he did not know, but would look into it.  In the meantime, they discussed coping skills that Goodvine could use to make it through the weekend.  (*See* Ex. #101, at 126.)  Goodvine acknowledged that reading and sleeping were his primary means of coping and assured Dr. Buhr that he would try to use these activities to calm and keep himself safe.  Noting

that Goodvine had stored medications in his cell in the past, Buhr asked if it would be safe to send him back to his cell and if he has any medication stored.  Goodvine stated that it would be safe and he did not currently have any medication saved up.  According to Buhr, Goodvine stated that he would try to keep himself safe using his coping skills. (*See* Ex. #101, at 126.)

On evaluation, Dr. Buhr found Goodvine was alert and oriented during this session, and appropriate eye contact was maintained.  His mood and affect were within normal limits and appropriately changing.  His thought process was logical, organized and future oriented.  Goodvine made reference to some thoughts about self-harm, but denied a current plan or intent for self-harm and agreed to use his coping skills to reduce his stress, as well as to contact staff if his thoughts of self-harm became more intense. Based on this evaluation, Dr. Buhr maintained Goodvine's current diagnosis and mental health code, making a plan to continue clinical monitoring, look into his WRC referral and respond to his requests.  (*See* Ex. #101, at 126.)

On July 15, Buhr received a call from Lieutenant Morrison, who reported that Goodvine was threatening to harm himself.  Goodvine felt that he could not keep himself safe in his cell.  Buhr directed Morrison to place Goodvine in observation with the standard restrictions on property.  When Lieutenant Morrison asked if it would also be possible to add a blanket and orthopedic heel cups for a medical condition, Dr. Buhr stated that he would allow the blanket if Morrison felt it was appropriate, but that he wanted to speak with HSU before making a decision about the heel cups.  Buhr later

determined that the heel cups were not medically necessary, so they were not allowed. (*See* Ex. # 101, at 127.)

### INCIDENT OF SELF-HARM ON JULY 16

On July 16, 2012, Dr. Buhr met with Goodvine to review his placement in observation. During that meeting, Goodvine stated that while he was doing "OK," he had been feeling suicidal the previous day and, after being placed into observation, had the urge to cut himself, going so far to preparing an item he found in his cell to do so. Reminding Goodvine of the coping skills he used to get past these urges, Buhr asked Goodvine to surrender the item. Goodvine told Buhr that he had flushed the item down his toilet. Goodvine denied having any current suicidal thoughts, but reported feeling "unstable." Dr. Buhr informed Goodvine that he would keep him in observation for further monitoring.

Later that same day, Dr. Caldwell-Barr was the on-call clinician at CCI. That evening, she was in the DS-1 unit attending to another inmate in observation who was engaging in self-harm. As that situation escalated, Goodvine reported that he also wanted to cut himself. (*See* Ex. #103, Incident Report # 42896; *see also* Ex. #101, at 130.) Dr. Caldwell-Barr spoke with Goodvine until he appeared to calm down, informing her that he would not engage in self-harming behaviors. As the situation escalated with the other inmate, however, Dr. Caldwell-Barr observed Goodvine cutting his forearm and smearing blood on his window. Goodvine then immediately went to the left rear area of

his cell and bent over, then ran back and continued smearing blood on his cell window. Dr. Caldwell-Barr immediately brought this to the attention of DS-1 security staff.

Several officers, including Lieutenant Boodry and Officer Julson, removed Goodvine from his cell and placed him into a restraint chair.  When asked, Goodvine refused to provide answers as to what he was using to cut himself and where the item was.  Nurse Strecker conducted a medical evaluation of his injuries and determined that Goodvine should be sent to Divine Savior Hospital for sutures.  Nurse Strecker dressed and wrapped Goodvine's laceration as he was prepared for transport.  Goodvine was then escorted to the intake garage by Officers Walker, Wilkins and Lieutenant Bridgeman.

A short time later, Goodvine was escorted back to DS-1 and placed into the restraint chair.  Lieutenant Boodry was then informed that Goodvine refused to be transported to Divine Savior Hospital for medical treatment.

While Goodvine's cell was being cleaned, searched, and prepared with full mechanical bed restraints, he was again questioned about the item he used to cut himself, but refused to cooperate.  Although the item was not found in his cell after a search, Goodvine was reportedly compliant and followed directions as he was removed from the restraint chair and placed into the bed restraints.  Nurse Strecker conducted another medical evaluation and provided medical treatment to the wound.  Thereafter, wellness checks were conducted every two hours throughout the time that Goodvine was in restraints.

After Goodvine's restraints were removed, he was returned to observation status with constant monitoring.  Goodvine then provided a supervisory officer (Captain

Lipinski) with the cutting tool (a tip-sharpened pen insert) that he used to make the single laceration on his arm, stating that he was done engaging in acts of self-harm.

## SUBSEQUENT TREATMENT AT CCI AND WRC

Goodvine continued to be monitored by PSU staff, including Drs. Laurent, Buhr and Caldwell-Barr following the incident on July 16, 2012.  Goodvine  remained in observation until he was released by Dr. Schwebke on July 22, 2012.  (Ex. #101, at 135.)

In early August, Goodvine reported having some "growing distress" while he awaited his transfer to WRC.  (Ex. #101, at 136.)  On August 8, Goodvine worked with Dr. Buhr on distress-tolerance techniques.  Goodvine identified focusing on legal work and learning French as primary strategies for coping with his distress.

On August 29, 2012, Goodvine was transferred to WRC to participate in the Coping Skills in Segregation program.  On October 15, 2012, Goodvine "went on a rampage" while at WRC, severely injuring himself.  *See Goodvine v. Monese, et al.,* Case No. 13-cv-1057 (E.D. Wis.) (Dkt. #1, Complaint, Ex. C); *see also Goodvine v. Pasha et al.*, Case No. 13-cv-17 (E.D. Wis.) (Dkt. #1, Complaint).  After being treated at a local hospital in Oshkosh, Goodvine was returned to CCI on October 18, 2012, without having successfully completed the Coping Skills program.[16]

---

[16] According to a "Psychology Note" dated October 15, 2012, Goodvine completed the requirements for the Coping Skills Program at WRC, but continued to demonstrate the same manipulative behavior that he exhibited at CCI, namely, threats of suicide and hunger strikes for secondary gain.

PSYCHOLOGICAL EVALUATIONS

On September 8, 2012, Dr. Anna C. Salter completed an evaluation of Goodvine for the purpose of "better understanding his psychological make-up" and assisting WDOC with his "program planning and management issues." (Exh. # 101, at 139-61). The evaluation was based on Goodvine's DOC records, interviews conducted in May and June 2012, and a series of inventories. During one of the interviews, Goodvine acknowledged that he had attempted suicide by overdosing on medication a couple of times while incarcerated. With respect to his pattern of self-harm by cutting, Goodvine explained that he was not trying to kill himself on these occasions. Rather, he was just "trying to release some energy," adding that he would cut himself on those occasions when he was unable to "reach out and hit someone else[.]" (Exh. # 101, at 140).

In a classic bit of clinical understatement, Dr. Salter observed that Goodvine has "adjusted poorly" in prison, continuing to commit offenses that have earned him long periods in segregation, as well as additional criminal charges. (Ex. #101, at 158.) Salter noted that Goodvine "has been almost constantly oppositional and defiant with authority and it appears he seeks out negative interactions." (*Id*.) She attributed this to two factors:

> First, he is bored in prison and he remains a thrill seeker. He considers the lawsuits a way to alleviate his boredom, whatever other purpose they serve. Second, he has developed over the years some of the grievance, paranoia, and resentment characteristic of violent offenders. Thus, he expects poor treatment and reads poor treatment into interactions, whether it is there or not.

(*Id*.) Dr. Salter further noted that Goodvine was intelligent, but that he also suffered from a lack of socialization and a "world-view" that distorted his thinking.

In the final paragraph of her evaluation, she returned to clinical understatement, concluding that Goodvine "poses a challenge to Corrections" because of his background of neglect and defiant attitude.

> His misattributions of intent, his stimulus-seeking, his lack of knowing how to get along with people – none of these can be solved by rules and regulations, no matter how fairly administered.  Mr. Goodvine will have to make some changes himself to be able to finish out his period of incarceration without incurring more disciplinary infractions or even new charges.  Corrections can and should continue to try to work positively with Mr. Goodvine.  Staff need to be aware that he misattributes intent, and explain whatever they are doing with him carefully to avoid, for example, getting hit in the face.  However, it is unlikely that any authority will be able to deal with him successfully without his making some changes in his mindset.

(*Id.*)

Dr. Robbins endorsed Dr. Salter's conclusion in his neutral expert report submitted in this case, adding that Goodvine has "a very poor self-image and does not have the tools to manage successfully in a correctional facility[.]"  (Dkt. #166, at 5.) After conducting his own interview, Dr. Robbins observed that Goodvine's poor self-image and distorted perceptions triggered a destructive cycle in his current incarceration.

> He is very sensitive to perceived mistreatment and this leads to increasing hopelessness and impulses to harm himself.  Once these impulses begin, he is not aware of any options to manage these feelings, other [than] eventually to hurt himself, usually accomplished with cutting.  He believes he has more such thoughts and no way to distract himself when he is in segregation.  Unfortunately, his self-injury is treated as a rules infraction rather than as a symptom of his psychiatric illnesses, and it leads to even more time in segregation, which then further exacerbates his psychiatric illnesses.

(*Id*. at 5-6.)   Concluding that Goodvine's symptoms are "most consistent" with borderline personality disorder along with traits of an antisocial personality disorder, Dr.

Robbins recommends continuing an "aggressive" regimen of psychotropic medication and "proper treatment, in particular, Dialectical Behavior Therapy," as a means to stop this destructive pattern.  (*Id*. at 6.)  Acknowledging that Goodvine had been receiving DBT treatment at CCI, Dr. Robbins noted that Goodvine "has not always been cooperative with such treatment" due to his "impulsive nature" and his sense of "hopelessness."  (*Id*.)

Sadly, Goodvine has been repeatedly offered treatment that would lead to DBT, but to date has declined it.  (Dkt. #215.)  Goodvine was transferred to the WRC most recently on November 7, 2013.  WRC staff determined that Goodvine must first successfully complete the program called Coping Skills in Segregation before he can begin the DBT program offered at WRC.  Goodvine rejected the Coping Skills program and was returned to CCI.

OPINION

In moving for summary judgment, defendants argue that Goodvine fails to advance evidence of deliberate indifference to his health or safety, entitling them to qualified immunity from Goodvine's claims that they failed to protect him from self-harm.  In his cross-motion for summary judgment, Goodvine disputes the level of care that he has received and maintains that additional injunctive relief is required to keep him safe from self-harm.  The parties' contentions are addressed in more detail below under the governing legal standards that dictate the outcome in this case.

## I.     Summary Judgment

The purpose of summary judgment is to determine whether the parties have gathered and can present enough evidence to support a jury verdict in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001).   Summary judgment is appropriate if there are no genuinely disputed material facts, and if on the undisputed facts, the moving party is entitled to judgment as a matter of law.   FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The applicable substantive law will dictate which facts are material.   *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).   A factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Serv., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005).

In determining whether a genuine issue of material fact exists, the court must construe all facts in favor of the nonmoving party.  *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).  Even so, the non-movant may not simply rest on the allegations in his pleadings; rather, he must respond by presenting specific facts that would support a jury's verdict in his favor on his claims.  *Hunter v. Amin*, 583 F.3d 486, 489 (7th Cir. 2009); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).

The court notes that Goodvine has filed a response to defendant's summary judgment motion, but failed to comply fully with the court's procedures.  In particular, he did not respond to all of defendants' proposed findings of fact.  Therefore, the court

must conclude that certain facts proposed by defendant are undisputed to the extent that they are supported by admissible evidence. *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994); *Strong v. Wisconsin,* 544 F. Supp. 2d 748, 759-60 (W.D. Wis. 2008). The pending motions have otherwise been fully briefed by the parties.


## II.    Qualified Immunity

Governmental actors performing discretionary functions enjoy "qualified immunity," meaning that they are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007)). As a defense, "[q]ualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine whether a defendant is entitled to qualified immunity, a court must consider two questions: (1) whether plaintiff has alleged or shown a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the

time the alleged violation occurred.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

"Qualified immunity is applicable unless the defendant's conduct violated a clearly

established constitutional right."  *Id.*  Although qualified immunity is a defense, the

plaintiff bears the burden of defeating it. *Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir.

2003).


## III.    Eighth Amendment -- Failure to Protect from Self-Harm

The Eighth Amendment, which prohibits "punishment" that is "cruel and

unusual," imposes a duty on prison officials to provide "humane conditions of

confinement" by ensuring that inmates receive adequate food, clothing, shelter, and

medical care.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Prison officials also must

ensure that "reasonable measures" are taken to guarantee inmate safety and prevent

harm.   *Id*.   Echoing the qualified immunity standard, to prevail under the Eighth

Amendment based on a failure to prevent harm, an inmate must demonstrate that (1)

the harm that befell the prisoner was objectively, sufficiently serious and a substantial

risk to his health or safety; and (2) the individual defendants were deliberately indifferent

to that risk.  *Id*.; *see also, e.g., Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citing

*Matos ex. Rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir. 2003) (citation omitted)).

Liability under the deliberate-indifference standard requires more than negligence, gross

negligence or even recklessness; rather, it is satisfied only by conduct that approaches

intentional wrongdoing, *i.e.*, "something less than acts or omissions for the very purpose

of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Suicide, attempted suicide and other acts of self-harm clearly pose a "serious" risk to an inmate's health and safety.   *See Collins*, 462 F.3d at 760 (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001)); *see also Rice ex. Rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies.").   At the same time, courts have recognized that "[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting."   *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *see also Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 990 (7th Cir. 1998) ("No one can predict suicide with any level of certainty[.]").   Where the harm at issue is a suicide or attempted suicide, deliberate indifference requires "a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded that risk."   *Collins*, 462 F.3d at 761 (citing *Matos*, 335 F.3d at 557).

### A.  Failure to Protect from Self-Harm on October 1, 2011

#### 1.  Claims Against Drs. Kumke, Nelson, and McLaren

Having been placed in DS-1 after attacking another inmate on September 29, 2011, Goodvine contends that he told Drs. Kumke, Nelson, and McLaren that he was having thoughts of self-harm before cutting himself on October 1, but that these defendants did nothing to address his need for help.  In particular, Goodvine claims that they were each deliberately indifferent to his need for protection when they failed to place him in observation on September 29 and 30.

As outlined above, the record shows that Dr. Kumke saw Goodvine for a clinical evaluation on September 29, and considered placing him in observation. (Ex. #101, at 62.) Kumke evaluated Goodvine and made a plan for a follow-up evaluation the next day, believing that he was not a threat to himself at that time. Drs. Nelson and McLaren conducted the follow-up evaluation as directed by Dr. Kumke, on September 30, and reached the same conclusion. Based on their evaluations, which are outlined above, Drs. Nelson and McLaren found that Goodvine was depressed, but they did not believe that he was in imminent danger of self-harm. (Ex. #101, at 63.)

Drs. Kumke, Nelson and McLaren reached their conclusions after evaluating Goodvine's demeanor, noting his eye contact and affect before determining that placement in observation was not warranted. During these consultations, all three psychologists spent time encouraging Goodvine to use the coping skills he had learned previously. Goodvine does not dispute that their determinations were reached after a professional evaluation nor show that these defendants' actions were blatantly inappropriate, although he disagrees with their conclusion or diagnosis that he was not an immediate danger to himself. Disagreement with a course of treatment, however, does not give rise to an inference that a prison psychologist acted with deliberate indifference to a prisoner's needs. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010); *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). The course of treatment may not have been optimal in hindsight, given that Goodvine cut himself the very next day on October 1, but this does not evince deliberate indifference on the part of the psychologists who evaluated him on September 29 and September 30. In that respect,

physicians and psychologists "do not practice with a crystal ball in hand."  *Sanville v. McCaughtry*, 266 F.3d 724, 736 (7th Cir. 2001).

Even if one of his psychologists had placed him in observation on September 29 or September 30, it is certainly open to question whether such placement would have prevented the harm that occurred on October 1, given the lengths that Goodvine went to hide the metal pieces that he ultimately used to cut himself by secreting them in his hair. In any event, Goodvine does not present evidence that Drs. Kumke, Nelson or McLaren knew, but deliberately ignored a substantial risk of self-harm before Goodvine cut himself on October 1.  Absent such evidence, Goodvine does not raise a genuine issue for trial regarding his claim that these psychologists failed to protect him from self-harm on that occasion.   Drs. Kumke, Nelson and McLaren are, therefore, entitled to qualified immunity from these claims.  Defendants' motion for summary judgment on this issue will be granted, and Goodvine's motion will be denied.

## 2.  Claims Against Sergeant Schneider

Goodvine also claims that Sergeant Schneider knew he was at risk, but failed to protect him from harm on October 1.  At approximately 5:20 p.m. on October 1, Goodvine claims that he told Sergeant Schneider that he was "feeling unsafe" and needed to go to the observation area for additional monitoring "immediately."  (Dkt. #236, at ¶ 128.)  Schneider responded that there were no cells available in the observation area and then began to walk away.  (*Id*. at ¶ 129.)  Goodvine claims that he then told Schneider that he needed to see clinical PSU staff so that he could be put on observation

status or else he would seriously injure himself.  (*Id.*)  He claims that Sergeant Schneider did nothing to help before he cut himself at 6:31 p.m. that day.

As a correctional officer, Schneider notes that he does not have authority to place a prisoner in observation.  (Dkt. #93.)  Such a decision can be made only by PSU staff or a supervisory official (warden or captain) if no clinician, crisis intervention worker or physician is available.  *See* WIS. ADMIN. CODE § DOC 311.04(4).  Schneider does not recall Goodvine requesting to see PSU staff or reporting that he was having thoughts of self-harm before cutting himself on October 1.  If such a request had been made, Schneider contends that he would have followed protocol and notified PSU or a supervisory official.  Schneider maintains further that he did not ignore or refuse any request by Goodvine to be seen by PSU staff and that he protected Goodvine to the best of his ability while conducting regular rounds in the DS-1 Unit.

In support of his claim, Goodvine presents an affidavit from another inmate assigned to DS-1, Darrin Gruenberg, who reportedly heard Goodvine inform Schneider that he would seriously injure himself if not taken (1) to the observation area of DS-1 and (2) to see clinical staff.  (Dkt. #239.)  An hour later, Gruenberg observed Goodvine smear blood on the window of his cell door, which he interpreted as a "cry for help." (*Id.*)  This raises a question of material fact regarding whether Schneider was aware that Goodvine presented a serious risk of self-harm, but failed to take reasonable measures to protect him by contacting PSU.  Accordingly, Sergeant Schneider is not entitled to qualified immunity or summary judgment on the claims against him.  For the same

reason, however, Goodvine's motion for summary judgment on this claim mustl also be denied.

## B.  Failure to Protect from Self-Harm on October 5

### 1.   Claims Against Dr. Kumke and Dr. McLaren

On October 5, Goodvine cut himself again while in observation status.  (Incident Report, #15862.)  Goodvine claims that he told Drs. Kumke and McLaren that he was suicidal, but that they did not upgrade his observation status to constant, one-on-one observation.

#### a.  Dr. Kumke

Although Dr. Kumke evaluated Goodvine on September 29, there is no evidence that he met with Goodvine in the days leading up to the cutting incident that occurred on October 5.  Rather, the record reflects that Dr. Kumke did not see Goodvine until after he returned from the hospital on October 5.  (Ex. #101, at 69.)  Goodvine does not dispute this or demonstrate that Kumke knew he was at risk for self-harm in the days immediately preceding October 5.  Absent a genuine issue of material fact, Dr. Kumke is entitled to qualified immunity from this claim and summary judgment as well.[17]

---

[17] Perhaps the trier of fact could infer that Dr. Kumke would or should hear of the October 1 incident, but since Goodvine was seen daily thereafter by Dr. McLaren, it would not be a reasonable inference that Kumke acted with deliberate indifference by leaving Goodvine's ongoing care to Dr. McLaren.

### b.  Dr. McLaren

After the October 1 incident and before Goodvine cut himself again while in observation, Dr. McLaren had evaluated Goodvine on October 3, 4 and 5.  McLaren continued Goodvine's placement in observation due to his recent self-harm behavior, his apparent depression and emotional instability; she also encouraged him to use coping skills to deal with his distress.  (Ex. #101, at 66-68.)  Goodvine presents affidavits from two DS-1 inmates (Freddie McLaurin and Ramon Prado) who reportedly overheard Dr. McLaren advise Goodvine that she would tell staff to keep an eye on him and watch him closely on October 5, 2011.  (Dkts. #242, #243.)  As Goodvine also concedes, he was housed in observation where security staff were supposed to conduct checks every 15 minutes.  (Dkt. #236, at ¶ 161.)  Likewise, his cell was monitored by a camera.  (*Id*.)

Under these circumstances, Goodvine cannot demonstrate that McLaren's decision (not to upgrade his status to direct, one-on-one observation) was blatantly inappropriate or that her actions rose to the level of deliberate indifference.  *See Berry*, 604 F.3d at 441.  Accordingly, Dr. McLaren is entitled to qualified immunity from Goodvine's claim that she failed to protect him from self-harm on October 5. Defendants' motion for summary judgment on this issue will be granted and Goodvine's motion will be denied.

### 2.  Claims Against Officers Millonig and Witterholt

Goodvine further claims that he told Officer Millonig and Officer Witterholt that he was having thoughts of self-harm during meal-tray pickup at noon on October 5, but

that they refused to place him under constant observation or contact PSU staff on his behalf.   Neither Millonig nor Witterholt recalls Goodvine asking to see PSU staff or expressing suicidal intentions during tray pick up that day.   Both officers state that, if Goodvine had made statements regarding having suicidal thoughts, they would have followed protocol by contacting the supervising officer for DS-1 and informing him/her of Goodvine's request for PSU contact.    The officers maintain further that they did not ignore or refuse any request by Goodvine to be seen by PSU staff and that they protected Goodvine to the best of their ability while conducting regular rounds in the DS-1 Unit on October 5.

Notably, Goodvine was already in observation status at the time in question and had been seen already by Dr. McLaren on October 5.[18]  (Ex. #101, at 68.)  Moreover, his cell had been searched the day before (October 4) and nothing was found.  (Incident Report, #15862.)   The unit log book also reflects that Goodvine had a medical appointment at 12:30 p.m., but he refused to be seen by HSU staff.  (Dkt. #89, Exh. # 102.)  Goodvine then cut himself at around 1:55 p.m. on October 5.

In opposition, Goodvine presents affidavits from three other DS-1 inmates who overheard him tell both Officers Millonig and Witterholt that he needed to see clinical staff from PSU because he was planning on hurting himself on October 5.  (Dkt. # 240, Affidavit of Joseph Jiles; Dkt. # 242, Affidavit of Freddie McLaurin; Dkt. # 243, Affidavit of Ramon Prado).  Although none of these inmates indicate what time they heard Goodvine make these comments, the affidavits might normally raise a question of

---

[18] Goodvine has submitted a copy of the observation record, showing that he spoke with Dr. McLaren at around 10:45 a.m. on October 5.

material fact regarding whether Officers Millonig and Witterholt were aware of a serious risk of self-harm, but failed to take reasonable measures to protect Goodvine by contacting PSU for an additional consultation before Goodvine cut himself at around 1:55 p.m. on October 5.

Given that Goodvine had just been seen by PSU at 10:45 a.m., refused to see HSU staff at 12:30 p.m. and seemed to be in an observation unit without means to harm himself, the court does not believe a reasonable trier of fact could find deliberate indifference on these facts, particularly given Goodvine's repeated pattern of manipulating circumstances to get HSU, PSU and security to act as a matter of sport, at least not without evidence of a specific, credible threat of self-harm or some greater lapse in time than three hours after being seen by a psychologist and one and one-half hours of refusing to be seen by medical staff.  Officers Millonig and Witterholt are, therefore, entitled to summary judgment on the claims against them and Goodvine's motion for summary judgment on this claim will be denied.


### C. Failure to Protect from Self-Harm on October 12

#### 1. Claims Against Meisner, Nickel, Morgan, Dr. Kumke, Dr. Johnson, and Dr. McLaren

Goodvine claims that Drs. Kumke, Johnson and McLaren were made aware that he was having thoughts of self-harm shortly before he cut himself on October 12, 2011, because of a letter that he wrote to Warden Meisner.  Goodvine also contends that Warden Meisner gave a copy of the letter to Security Diretor Nickel and Captain Morgan.  Goodvine complains that none of these defendants did anything to help him or

protect him from self-harm that occurred on October 12.  These defendants are entitled to qualified immunity for reasons set forth briefly below.

First, the record reflects that Warden Meisner received a letter from Goodvine on October 11, in which Goodvine stated that he did not "feel like going on" and that he was "going to kill [himself]" if he had to stay in segregation.  (Dkt. #88, ¶ 39 & Ex. #112.)  Meisner sent a written response to Goodvine on October 12, advising him that he had notified HSU and PSU and directed them to "closely monitor [him]."  (*Id.* at ¶ 41 & Ex. # 113.)  Meisner also provided a copy of that response to Morgan and Nickel for their information.  (*Id.* at ¶¶ 42-43.)  As Security Director, Nickel deferred to Morgan, who was the administrative captain in charge of the segregation unit.  (Dkt. #91, ¶ 9.)  In turn, Morgan notified staff on DS-1 of Goodvine's letter and his stated intent to engage in self-harm.  (Dkt. #90, at ¶ 32.)  Goodvine does not dispute that his letter followed the chain of command or show that the actions taken by Meisner, Nickel and Morgan were unreasonable.  On the contrary, while such referrals have an element of passing the buck, the reality of any large organization is that responsibility must be passed to those in the best position to act, making the defendants' actions in getting Goodvine's threat to staff on the ground an eminently reasonable act.

Second, Dr. Kumke responded to the letter by meeting with Goodvine at his cell door on DS-1 on October 12.  According to Kumke, Goodvine acknowledged having thoughts of self-harm, but stated that he had no plans or urges to act on them at that time.  Kumke discouraged Goodvine from engaging in self-harm and emphasized the use of adaptive coping skills to help with his distress.  (*See* Ex. #101, at 76.)  Goodvine does

not demonstrate that Kumke's efforts were blatantly inappropriate nor that his response rose to the level of deliberate indifference. *See Berry*, 604 F.3d at 441; *Ciarpaglini*, 352 F.3d at 331.

Goodvine claims that Dr. Kumke should nevertheless have put him back in observation status. As Goodvine concedes, however, he advised Kumke more than once that he had no immediate intention to act on any thoughts of self-harming before the October 12 incident occurred. (Dkt. #236, at ¶¶ 187, 200.) While Goodvine argues that Kumke knew or should have known that Goodvine's urges to cut himself "could quickly turn imminent," that is precisely the problem with most of Goodvine's claims. (Dkt. #236, at ¶ 201.) Given the inherent difficulty, if not impossibility, in predicting suicidal behavior generally, and with an intelligent, manipulative individual like Goodvine in particular, Goodvine cannot demonstrate the requisite deliberate indifference here. After talking with Goodvine, Kumke obviously felt that the risk of self-harm on that occasion did not offset Goodvine's continued progress back in segregation. In that regard, Dr. Kumke's diagnosis was apparently mistaken, but an incorrect diagnosis does not amount to deliberate indifference. *See Domino*, 239 F.3d at 756. Absent a showing of deliberate indifference, Goodvine does not demonstrate that Dr. Kumke violated his constitutional rights on October 12.

Third, there is no evidence that Drs. Johnson or McLaren knew about the letter Goodvine sent to Warden Meisner nor that Goodvine was at risk for self-harm in the days preceding October 12, 2011. While Dr. Kumke visited with Goodvine on a daily basis leading up to the October 12 incident, neither Dr. Johnson nor Dr. McLaren

evaluated him before he cut himself.  Because Goodvine does not demonstrate that Drs. Johnson and McLaren knew he was an obvious risk of cutting himself but failed to help, these defendants, too, are entitled to qualified immunity.  Accordingly, defendants' motion for summary judgment with respect to all of these defendants will be granted and Goodvine's motion will be denied.

### 2.  Claims Against Officer Julson

Goodvine contends that he also informed Officer Julson that he was suicidal and requested placement in observation at some point on October 12, 2011, but that Julson disregarded his request.  Specifically, when Goodvine asked Julson to notify Dr. Kumke or Dr. Johnson, stating that he needed to speak with a clinician urgently, Goodvine avers that Julson reportedly responded he would "notify the sergeant" or other ranking officer.

Officer Julson was assigned to work second shift in the DS-1 Unit on October 12, 2011.  However, Julson does not recall Goodvine requesting to see PSU staff nor expressing any intent to harm himself on that date.  If such a request had been made, Schneider contends that he would have followed protocol and notified PSU or a supervisory official.  Julson maintains further that he did not ignore or refuse any request by Goodvine to be seen by PSU staff and protected Goodvine to the best of his ability while conducting regular rounds in the DS-1 unit that day.  In response, Goodvine submits affidavits from two other inmates (dkt. #240, Decl. of Joseph Jiles; dkt. #243, Decl. of Ramon Prado), both of whom state that they overheard Goodvine tell Julson that he was going to harm himself, but that Julson did nothing to help.

As a correctional officer, Julson lacked authority to place Goodvine in observation status.  Goodvine had already been evaluated by Dr. Kumke on October 12, though it is not clear what time that evaluation occurred.  Likewise, it is not clear what time Goodvine reportedly asked Julson to contact PSU before cutting himself at around 6:20 p.m. that evening.  Thus, there appears to be a material issue of fact about whether Julson knew that Goodvine was at serious risk of self-harm, but failed to alert a supervisor or summon PSU staff to conduct a further evaluation before Goodvine cut himself at 6:20 p.m. on October 12.  Accordingly, Julson is not entitled to qualified immunity or summary judgment on the claims against him.  Goodvine's motion for summary judgment on this claim will also be denied.

### D. Failure to Protect from Self-Harm on October 13

After cutting himself on October 12, Goodvine was again placed in the observation area of DS-1 upon his return from the hospital.  When Dr. Johnson checked on Goodvine the following morning to evaluate his placement in observation, Goodvine did not respond and appeared to be asleep.  Goodvine nevertheless claims that he told Officers Wiley and Conroy that he was having thoughts of self-harm on October 13, but that neither officer notified a clinician or a supervisory officer to have him placed in restraints.  (Dkt. #236, at 230.)  Likewise, neither officer made an effort to search Goodvine's cell to ensure that he had no means to harm himself.  (*Id*.)  Goodvine submits affidavits from two other inmates (dkt. #240, Decl. of Joseph Jiles; dkt. #243, Decl. of Ramon Prado), both of whom state that they overheard Goodvine tell Officer Conroy at

73

around 2:00 p.m. on October 13, that he was suicidal and needed to see someone from PSU.   Goodvine claims, therefore, that the officers did nothing to prevent him from cutting himself at approximately 3:50 p.m.  (Incident Report #16806.)

### 1.  Dr. Johnson

The undisputed facts establish that Goodvine did not communicate with Dr. Johnson when she visited his cell on the morning of October 13, 2011.   Because Goodvine neither alleges nor shows that Dr. Johnson knew he was at an obvious risk of cutting himself, but failed to help, he does not demonstrate that a constitutional violation occurred.   Johnson is, therefore, entitled to qualified immunity from this claim, defendants' motion for summary judgment on this issue will be granted and Goodvine's motion will be denied.

### 2.  Officers Conroy and Wiley

Conroy was working in the segregation unit as a "program officer," escorting inmates to appointments with PSU and medical staff.   Conroy denies ignoring Goodvine and does not recall him making any request to be seen or expressing thoughts of self-harm.  There is no affidavit in the record from Officer Wiley.  Based on this record, there is a question of fact about whether Officers Conroy and Wiley knew that Goodvine was at serious risk of self-harm, but failed to summon PSU staff or a supervisory official to evaluate the situation.   As a result, neither Conroy nor Wiley are entitled to qualified

immunity.   Therefore, defendants' motion for summary judgment on these claims must be denied.   Goodvine's motion for summary judgment on this claim will also be denied.

### E.  Failure to Protect from Self-Harm on July 16

#### 1.  Claims Against Dr. Buhr

Goodvine claims that Dr. Buhr failed to protect him from the harm that he inflicted on himself on the evening of July 16, having been advised earlier that day that Goodvine was having "cutting urges" and had sharpened an item that he found in his cell for that purpose.  (Dkt. #236, at ¶ 269.)  When Dr. Buhr asked Goodvine to surrender the item, however, Goodvine admits saying that he had flushed it down the toilet.  (Ex. #101, at 128.)  Still, Goodvine claims that Dr. Buhr should have known that he may have hidden a sharp object in his cell and, therefore, failed to alert security staff, request a search of Goodvine's cell or adjust Goodvine's status to direct, one-on-one observation.

Given Goodvine's assurance that he had destroyed the instrument of self-harm and the fact that Goodvine was already in observation status, it is not clear that Goodvine was an obvious risk for cutting himself when Buhr evaluated him early in the day on July 16.  Moreover, even if Dr. Buhr had requested a search of Goodvine's cell, it would not likely have done any good.  Officers searched the cell after Goodvine cut himself and were still unable to locate the item that he used.  Goodvine later voluntarily surrendered the tip-sharpened pen insert used to cut himself to Captain Lipinski, apparently having concealed it on his person or in his smock.

Under all these circumstances, Goodvine does not demonstrate that Dr. Buhr's decision (not to upgrade his status to direct, one-on-one observation) was blatantly inappropriate or that his actions rose to the level of deliberate indifference.  *See Berry*, 604 F.3d at 441.   Accordingly, Dr. Buhr is entitled to qualified immunity from Goodvine's claim that he failed to protect him from self-harm on July 16, 2012, defendants' motion for summary judgment on this claim is granted and Goodvine's motion is denied.

## 2.  Claims Against Dr. Caldwell-Barr

On the evening of July 16, while another inmate in observation was engaging in self-harm, Goodvine claims that he pleaded with Dr. Caldwell-Barr to be placed in restraints.   Instead, Caldwell-Barr spoke with him and encouraged him to use coping skills.   Although Goodvine disputes it, Caldwell-Barr further states that he appeared to calm down and gave her some kind of assurance that he would not engage in self-harm. (Ex. #103, Incident Report # 42896; *see also* Ex. #101, at 130.)   Caldwell-Barr also encouraged another prisoner in a nearby cell (identified by Goodvine as Randy McCaa) to counsel Goodvine that self-harm was not the answer.  (Dkt. #236, at ¶¶ 294, 299.) Shortly thereafter, Dr. Caldwell-Barr observed Goodvine cutting his forearm and smearing blood on his cell window.   She immediately alerted nearby officers who were attempting to manage another inmate in observation also in crisis.

Goodvine maintains that he never told Dr. Caldwell-Barr that he would not engage in self-harm on the evening of July 16 and that her efforts to counsel him on that

occasion were unprofessional.   (Dkt. #236, at ¶¶ 290-99.)   Instead of counseling him, Goodvine appears to claim that she should have immediately placed him on direct, one-on-one observation or in restraints, such as a restraint chair.

While Goodvine disputes the effectiveness of Dr. Caldwell-Barr's methods, he cannot demonstrate that her efforts were deliberately indifferent under what must have been a truly horrific scenario, as she attempted simultaneously to assist another inmate actively engaged in self-harm.   One could hardly devise a situation less conducive to providing professional psychological evaluation and assistance.   In this difficult context, no reasonable trier of fact could find Dr. Caldwell-Barr's decisions about how to best manage the crisis that presented itself within the observation area of DS-1 on the evening of July 16 to embody deliberate indifference.   *See Berry*, 604 F.3d at 441.   Accordingly, Dr. Caldwell-Barr is entitled to qualified immunity from Goodvine's claim that she failed to protect him from self-harm on July 16, 2012, defendants' motion for summary judgment on this claim is granted and Goodvine's motion is denied.


### 3.  Claims Against Lieutenants Boodry and Bredeman

Lieutenants Boodry and Bredeman were present in the DS-1 unit on the night of July 16 as well, apparently managing another inmate who was engaging in self-harm. Both maintain that they responded promptly when Dr. Caldwell-Barr advised them that she observed Goodvine cutting himself.  (Dkt. #78, ¶¶ 6-7; Dkt. #79, ¶¶ 6-7.)  Goodvine claims that he told Boodry and Bredeman that he was having serious thoughts of

imminent self-injury and asked to be placed in restraints, but that the officers refused to apply restraints.

Decisions about an inmate's placement in observation and the conditions of confinement within that status are primarily vested with clinicians, crisis intervention workers or physicians.  WIS. ADMIN. CODE § DOC 311.04(4)(a)-(c).  When Goodvine reportedly asked Boodry and Bredeman to place him in restraints, he concedes that Dr. Caldwell-Barr was present, indeed *standing* at his cell door.  (Dkt. #236, at ¶ 291.)  As Goodvine concedes further, Caldwell-Barr was attempting to counsel him at that time and to calm him.  (*Id.*)  To the extent that Boodry and Bredeman deferred to Dr. Caldwell-Barr's decisions about how best to manage the ongoing crisis, Goodvine cannot establish that either officer acted unreasonably or with deliberate indifference to an imminent risk of harm.   Under these circumstances, both Lieutenants Boodry and Bredeman are entitled to qualified immunity from the claims against them, defendants' motion for summary judgment on this issue is granted and Goodvine's motion is denied.

## IV.    Eighth Amendment - - Denial of Adequate Medical Care

Prison officials violate the Eighth Amendment if they are "deliberately indifferent to prisoners' serious medical needs."  *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  To survive summary judgment on his Eighth Amendment claim, plaintiff must submit evidence showing:  (1) he was suffering from an objectively serious medical condition; and (2) that defendants were subjectively "aware of the condition and knowingly disregarded it."  *Ortiz v. Webster*, 655

F.3d 731, 734 (7th Cir. 2011) (citing *Farmer*, 511 U.S. at 837; *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).

Here, Goodvine claims that Captain Salter denied him access to medical care on July 16, 2012, by retaining him at CCI for treatment of his self-inflicted wounds, rather than sending him to the hospital. Goodvine claims further that Ankarlo and Heise denied him DBT treatment for his personality disorder when Dr. Harris's referral to the WRC was declined in February 2012.  These claims are addressed separately below.

### A.  Denial of Medical Care on July 16, 2012

#### 1.  Claims Against Captain Salter

After Goodvine cut himself on July 16, the record reflects that Lieutenant Boodry and other officers removed Goodvine from his cell and placed him in restraints.  When asked, Goodvine refused to provide answers as to what he was using to cut himself or tell the officers where the item was.  An HSU staff member (Nurse Strecker) conducted a medical evaluation of Goodvine's injuries and determined that he needed to be sent to Divine Savior Hospital for sutures.  Nurse Strecker dressed and wrapped Goodvine's laceration as he was prepared for transport.

At approximately 11:45 p.m., transportation staff were available to transport Goodvine to DSH and Goodvine was escorted to the intake garage by Officers Ostrander, Walker, and Wilkins.  Lieutenant Bredeman also accompanied Goodvine.  Goodvine was then placed in a shower and told to remove his smock in exchange for a paper smock to prepare for transport.  Given that the sharpened object was not recovered from

Goodvine's cell, Captain Salter directed that Goodvine be placed in a paper gown/smock as he believed at the time that Goodvine had secreted the cutting device either in the smock he had been wearing while cutting his arm or on/in his person.  Goodvine refused to remove his smock as directed.  Bredeman gave Goodvine a direct order to remove the smock and Goodvine again refused stating, "Then I am not going, I refuse medical."  The shower was opened and Officers Walker and Wilkins removed the smock.

Goodvine was covered with a towel, escorted to back to DS1 for refusal of medical treatment and placed back into the restraint chair, as preparations for placing Goodvine in full bed restraints were made.  Lieutenant Bredeman also advised Captain Salter about the attempt to transport Goodvine to the hospital and Goodvine's refusal.   After returning to the DS-1 unit, Goodvine changed his mind about refusing medical care and stated that he wanted to go to the hospital.  Goodvine was again seen by HSU nursing staff for re-evaluation and treatment of his injuries.  Salter spoke with the nurse who had initially recommended sending Goodvine to the hospital for treatment.   The nurse informed Salter that the injury was not life threatening.

Based on this information, Salter decided to retain Goodvine at the institution because: (1) he had refused to go to the hospital initially with Lieutenant Bredeman; (2) the injury was not life threatening; and (3) Goodvine had a long and documented history of staff manipulation and could become physical.  (Dkt. #92, at ¶¶ 13-14.)   More specifically, Salter explains making that decision after "assess[ing] the immediate facts of staff and inmate safety, Goodvine's current and past behavior, that the injury was not life threatening, that by the inmate refusing transportation he was refusing treatment, and

found it was reasonable not to place inmate or staff in further risk of harm by using force to gain compliance from Goodvine to get or not to get medical treatment." (*Id.* at 15.)

Salter's concerns about inmate and staff safety were not unfounded in light of (1) Goodvine's admitted refusal to surrender the sharpened object he used to cut himself and (2) his resisting officers' efforts to locate that item.  Nevertheless, as Goodvine notes, his wound eventually became infected, which required a trip to the hospital for treatment and sutures on July 20, 2012.  (Dkt. #236, ¶ 329.)  Goodvine maintains that Salter should have sent him to the hospital for sutures on July 16, and that by interfering with his medical care or causing treatment to be delayed, he violated his rights under the Eighth Amendment.

Allegations of delayed care may violate the Eighth Amendment if the delay caused the inmate's condition to worsen or unnecessarily prolonged his pain.  *Estelle*, 429 U.S. at 104-05; *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (citations omitted). Even a few days' delay in addressing a severely painful, but readily treatable condition suffices to state a claim for purposes of the Eighth Amendment.  *Smith v. Knox County Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012); *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011).

Goodvine does not dispute that he refused to go to the hospital initially or fault officials for not sending him to the emergency room immediately after he cut himself on July 16.  Likewise, Goodvine has submitted several medical records from HSU indicating that he may have aggravated his injury on July 17, causing the cut that he sustained on

July 16 to become worse. Goodvine's allegations of delayed care, nevertheless, create a fact issue about whether Salter's subsequent decision to retain him at CCI (after Goodvine changed his mind about refusing treatment) was reasonable under the circumstances. Because that question is one for a jury to resolve, Salter is not entitled to qualified immunity. Therefore, defendants' motion for summary judgment on this issue must be denied. Goodvine's motion for summary judgment on this claim will also be denied.

### B. Denial of Adequate Mental Health Care

Goodvine also contends that WRC has an "intensive Personality Disorder program" that is specifically designed for prisoners like him. As noted above, Dr. Baird referred Goodvine for placement at WRC in January 2011 for purposes of participating in the DBT program. Goodvine contends, however, that Ankarlo and Heise denied him admission to WRC for purposes of participating in this program. Goodvine claims, therefore, that Ankarlo and Heise denied him access to adequate mental health treatment with deliberate indifference to his health and safety.

#### 1. Claims Against Ankarlo

Noting that WRC is a facility under the Department of Health Services, Ankarlo emphasizes that he has no power to compel them to accept or deny a particular patient. In other words, as Psychology Director for the DOC, Ankarlo has no involvement in the

ultimate decision to accept or refuse admission of DOC inmates who are referred to the WRC.

It is undisputed that WRC officials have the discretion to determine which patients it will accept, and that DOC personnel have no power to compel them to accept a particular patient.  Ankarlo also notes that the ultimate decision regarding Goodvine's January 2011 referral to WRC was made by Heise, who denied the referral in February 2011.  Because Ankarlo had no personal involvement in making the ultimate decision -- or for that matter, any other decision made regarding Goodvine's admission to WRC -- he is entitled to qualified immunity from Goodvine's claims against him.  Defendants' motion for summary judgment on the claims against Ankarlo will be granted and Goodvine's motion will be denied.


### 2.  Claims Against Heise

As the Admissions Coordinator, Heise is responsible for all the details required to transfer inmates in/out of WRC.  According to Heise, this entails: reviewing DOC referrals to WRC (1479s); discussing cases with DOC Clinicians and Security staff; understanding PRC (which apparently means "program review committee") computer data; communicating internally with other Institution Unit Supervisors and staff (particularly in relation to high profile cases); coordinating with other internal departments (transportation, medical, property, records); managing WRC bed space and maintaining a daily average census; ensuring accurate records are kept relating to inmate transfers and PRC status; and coordinating the actual intake process for each inmate.

In this instance, Heise considered the referral made by Dr. Baird on January 3, 2011, requesting Goodvine's placement in the DBT program, and denied that request for admission on February 22, 2011.   Heise reportedly determined that Goodvine's placement at WRC was not appropriate at the time based on his discussions with WDOC staff from CCI, the Green Bay Correctional Institution, Waupun Correctional Institution and the WDOC central office in Madison.   In particular, Heise learned on February 18, 2011, that a "mental health behavior management treatment plan" existed for Goodvine at the institutional level.   Based on that plan, Heise believed that Goodvine's needs could be met at CCI, where he was already working with PSU staff on coping skills based on the DBT model.   Heise does not recall the precise contents of the plan or have access to the plan, but the plan was discussed and agreed upon by Heise and by staff at WDOC.

Defendants note that Heise accepted a later referral by Dr. Jessica Harris on April 24, 2012, for Goodvine's placement in a coping skills program.   Dr. Harris recommended the transfer to WRC to assist Goodvine in managing his ineffective behavior, including self-injurious behaviors and interpersonal ineffectiveness that contributes to his time in segregation. On May 29, 2012, Heise found that Goodvine appeared appropriate for temporary placement at WRC and recommended CCI staff proceed with the placement. Heise based this decision on the fact that, at the time of the referral, Goodvine was "displaying observable motivation, beyond mere verbal statements of desire to change." Goodvine was transferred to WRC to participate in the coping skills program on August 29, 2012, and again on November 7, 2013, for additional programming.

Heise maintains that:  (1) Goodvine was not appropriate for transfer to WRC in February 2011; and (2) he did not deny Goodvine access to adequate mental health treatment with deliberate indifference because all of his actions were done in accordance with DHS policy and procedure and applicable professional standards in order to ensure Goodvine's safety and well-being, as well as the security of the institution.

From the record, it is evident that Heise reached his decision after consulting with prison officials and treatment providers who were in a position to know whether Goodvine was a good candidate for treatment at WRC.  Although defendants provide no information about WRC as a facility, its security levels or its behavioral requirements, Goodvine has not yet demonstrated that he is receptive to receiving treatment at WRC. To the contrary, he engaged in serious self-harm while at WRC following a referral for the Coping Skills in Segregation Program in August 2012.  Moreover, when Goodvine was referred most recently in November 2013, Goodvine refused treatment and was returned to CCI.   Under these circumstances, Goodvine has not demonstrated that Heise's decision (not to admit Goodvine to WRC in February 2011) was blatantly inappropriate or that his actions rose to the level of deliberate indifference.  *See Berry*, 604 F.3d at 441.  Accordingly, Heise is entitled to qualified immunity from Goodvine's claim against him, defendants' motion for summary judgment on this claim is granted and Goodvine's motion is denied.

## V.   Medical Malpractice Claims Against Drs. Buhr, Johnson, Kumke, McLaren and Nelson

Goodvine also contends that Drs. Buhr, Johnson, Kumke, McLaren and Nelson were medically negligent or committed malpractice by providing sub-standard mental health care in connection with the instances of self-harm set forth above.  A claim for medical malpractice requires proof that a health care provider breached a duty that resulted in injury or damages.  *Paul v. Skemp,* 2001 WI 42, ¶17, 242 Wis. 2d 507, 625 N.W.2d 860. Medical malpractice lawsuits require expert testimony to establish the standard of care. *Carney-Hayes v. Northwest Wisconsin Home Care, Inc.,* 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 699 N.W.2d 524.

Noting that Drs. Buhr, Johnson, Nelson, Kumke and McLaren provided psychological evaluation and treatment for Goodvine in "acute situations," defendants argue that Goodvine cannot prevail because he has no expert that would establish (1) the standard of care for a psychological professional treating a patient such as Goodvine; or (2) the standard of care for a psychological professional in the position of these defendants in evaluating and responding to acute circumstances such as those alleged here.  (Dkt. #212, at 53.)  Defendants argue further that Goodvine's state law claims are barred because he did not comply with Wis. Stat. § 893.82, which requires a claimant who intends to sue a state employee to serve on the attorney general a sworn and verified notice of claim within 120 days of the event causing the injury.  Wis. Stat. § 893.82(3).[19]

---

[19] The purposes of the notice-of-claim statute are three-fold:  (a) Provide the attorney general with adequate time to investigate claims which might result in judgments to be paid by the state. (b) Provide the attorney general with an opportunity to effect a compromise without a civil action or civil proceeding. (c) Place a limit on the amounts recoverable in civil actions or

The 120-day time period found in § 893.82(3) does not apply to a claim for damages due to medical malpractice.

Goodvine has neither replied to the defendants' motion for summary judgment on these grounds nor disputed any of the proposed findings of fact.  Thus, he appears to concede that he failed to file a notice of claim as required.  In any event, there appears no merit to his malpractice claims in light of the neutral expert's independent evaluation. Regardless, because it appears undisputed that Goodvine failed to comply with state law, defendants are entitled to summary judgment on the medical malpractice claims lodged by Goodvine in this case.

## VI.   Miscellaneous Motions and Requests for Relief Regarding Inadequate Policies and Procedures to Protect Goodvine from Self-Harm

Goodvine contends further that the supervisory defendants at CCI -- Warden Meisner, Security Director Nickel and Captain Morgan -- have failed to implement effective policies or procedures to keep him from repeatedly harming himself. Defendants have responded with an affidavit from Warden Meisner, detailing numerous policies and procedures in place to prevent self-harm by inmates at CCI.  The court has

---

civil proceedings against any state officer, employee or agent.  Wis. Stat. § 893.82(1).  No claimant may bring an action against a state officer, employee or agent unless the claimant complies strictly with the requirements of this section.  Wis. Stat. § 893.82(2m). In that respect, "no civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's employee's or agent's duties . . . unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employee or agent involved."  Wis. Stat. § 893.82(3).

included many of those policies in its factual overview at the beginning of what has now become an exhaustive effort to address Goodvine's concerns about the effectiveness of those procedures.   Notwithstanding the procedures outlined by defendants, Goodvine claims that the procedures in place are not regularly followed by security personnel in DS-1, placing him in danger of self-harm.

For example, Goodvine claims that while he was in observation from October 1 through October 7, 2011, none of the security officers performed checks as required every 15 minutes.  (Dkt. #236, at ¶ 165.)   To the extent that any such checks are documented, Goodvine contends that these records are fabricated.   On October 10, 2011, Goodvine reportedly advised Morgan that DS-1 staff were "not diligent in monitoring inmates with suicidal tendencies" and reportedly provided a detailed account of how staff failed to protect him on October 1 and October 5, 2011.  (Dkt. #236, at ¶¶ 191-92.)   Goodvine was in observation status from October 12 through October 17, 2011. (Dkt. #236, at ¶ 238.)   During this time, Goodvine estimates that 15-minute checks were done in observation on only half of the shifts (approximately seven of fifteen shifts).

Goodvine notes that all inmates in observation have a "sharps restriction," meaning that they are not allowed to have sharp objects, yet he was able to use sharp objects to cut himself on at least three occasions (October 6, 13, and December 6, 2011) while in observation.  (Dkt. #236, at ¶¶ 249-51.)   Goodvine reasons, therefore, that a sharps restriction was ineffective to prevent him from harming himself.

Goodvine references other lapses in his lengthy declaration and motion for summary judgment, many of which defendants note appear to exceed the screening order that granted Goodvine leave to proceed in this case.[20]  As these examples show, however, some of Goodvine's allegations about lax procedures followed at CCI overlap with his claims against Officers Conroy, Julson, Millonig, Schneider and Witterholt.   To the extent that they do, there are fact issues remaining for trial on whether these officers failed to follow procedure and thereby protect Goodvine from self-harm on October 1, 5, 12 and 13 of 2011.  Those claims are better addressed in connection with the specific failure-to-protect claims involving those individual defendants in this case.

Many of Goodvine's other claims appear to request prospective injunctive relief related to matters arising after the complaint was filed.   The court is not inclined to expand its inquiry into whether the measures mentioned by Goodvine could have, or should have, been used in connection with the instances of self-harm at issue in this case. To the extent that Goodvine seeks additional injunctive relief regarding these precautionary measures, his reach has exceeded his grasp:  a plaintiff seeking injunctive relief "must . . . ground [his] right to relief on events described in the complaint, not on

---

[20] Goodvine references other precautions that officials could take that would, in his view, have made him safer.  Goodvine notes that CCI has metal detectors and x-ray technology that could indicate the presence of a sharp object concealed on or within an inmate's person. (Dkt. #236, at ¶ 254.)  He notes that "chainmail gloves" could be used to conduct "oral searches without risk of injury."  (*Id*.)  He notes further that there are mechanical restraints, a restraint chair, "self-harm prevention mittens," strait jackets, padded body suits and direct observation that could be employed by personnel at CCI to prevent self-harm.  (*Id*.)  None of these, however, were used on Goodvine to prevent harm on the occasions that he complains of in this case.  (*Id*. at ¶ 253.)  Goodvine also notes that personnel at CCI could conduct body cavity searches to detect the presence of a sharp object concealed on or within an inmate's person.  (*Id*. at ¶ 256.)  Goodvine similarly notes that CCI has an unspecified "medical apparatus" to peer inside an inmate's ears, nostrils, and mouth.  (*Id*. at ¶ 255.)

matters that arise later." *Chicago Regional Council of Carpenters v. Village of Schaumburg*, 644 F.3d 353, 356 (7th Cir. 2011).

In January 2013, the court held a hearing on Goodvine's request for injunctive relief.   After that hearing, the court concluded that Goodvine's actions, whether voluntary or the product of compulsion, had escalated to the point that he was at substantial risk of killing or doing serious bodily harm to himself.   Absent a viable alternative, the court entered an order on February 7, 2013, directing defendants to adopt the following protocol: "defendants must place plaintiff in "observation" when he reports a strong urge to harm himself; and plaintiff may be released from observation status only upon the considered decision of his psychological care providers after seeking input from plaintiff. Additionally, defendants must place plaintiff in a physical (four-point, chair, or other type) restraint for a single, four-hour period if plaintiff (1) has been in observation for at least the twelve previous hours, (2) reports an uncontrollable urge to harm himself, (3) has some means to do so, and (4) volunteers to be placed in restraints." (Dkt. #59, at 2.)

Subsequently, the court's neutral expert concluded that putting Goodvine in restraints when he experiences the impulse to hurt himself is not an appropriate solution and could, in fact, exacerbate the problem by increasing his destructive impulses.   (Dkt. #166, at 6.)   Indeed, Dr. Robbins explains that allowing Goodvine restraints in response to impulses to harm himself is not only inappropriate and is actually counter-productive:

> [Goodvine] asks for restraints [when he has impulses to harm himself] because he does not know how else to avoid harming himself.   However, restraints could further exacerbate his poor self-esteem and his worries about being "out of control," and that could lead to an increase in his

> destructive impulses.   In addition, there are medical risks to being in
> restraints.  Furthermore, since his self-destructive impulses are frequent and
> can last for extended periods of time, it is not clear how staff would know
> when to start and stop applying restraints.   Finally, putting him in
> restraints when he experiences impulses to hurt himself will not help
> prepare Mr. Goodvine for dealing with stress following his release from
> prison.

(Dkt. #166, at ¶ 3.)   Robbins emphasizes proper treatment rather than the use of

restraints.

Goodvine has requested sanctions in this case for the defendants' failure to abide

by the preliminary injunction.   After considering Dr. Robbins's recommendation, those

motions will be denied.   The summary-judgment record reflects that Goodvine has been

referred for treatment leading to DBT at WRC, but he has continued to frustrate his own

efforts toward getting that treatment, the court is inclined to vacate its previous

injunction.   Before doing so, it will request briefing from the parties on issues left open by

the February 7, 2013 order.   In particular, the court asked the parties to work together to

develop a protocol that is more promising that the relief granted in the preliminary

injunction.   (Dkt. #59, at 18-19.)   The record reflects that the parties have adopted a

"Self Harm Management Scale," which Goodvine apparently agreed to complete on a

trial basis.   Unclear, however, is whether this protocol remains in place or, if it is, whether

it has been successful.   Before establishing a briefing schedule on whether this protocol

has been effective, however, the court will grant Goodvine's request to recruit pro bono

counsel so that the issue can be resolved in an expedient and fair manner.

**VII.**    **Goodvine's Motions for Leave to Amend or Supplement the Complaint**

Plaintiff requests leave to amend or supplement this action with a "parallel complaint." The proposed new complaint would include several more defendants (Dr. George Monese, Dr. Gary Maier, Dr. Dawn Laurent, Dr. Kurt Schwebke, and Dr. Baird) and additional claims for failure to adequately treat and/or protect from a dozen separate incidents of self-harm between October 1, 2011, and July 16, 2013.

Fed. R. Civ. P. 15(d) provides that "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The Seventh Circuit has emphasized, however, that "there is no absolute right to expand the case in this way[.]" *Chicago Regional Council of Carpenters v. Village of Schaumburg*, 644 F.3d 353, (7th Cir. 2011). Thus, "[a] district court has substantial discretion either to permit or to deny such a motion." *Id*.

This case has now moved far past the screening process required by the Prison Litigation Reform Act and the court has already granted plaintiff an opportunity to supplement his claims.  Allowing more claims and defendants at this late date would only add to the unwieldy issues presented in the original complaint and delay resolution of those existing claims.   Accordingly, Goodvine's requests for leave to supplement or amend his complaint will be denied.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. # 73) is GRANTED with respect to Goodvine's failure-to-protect claims against Officer Millonig, Officer Witterholt, Lieutenant Boodry, Lieutenant Bredeman, Dr. Buhr, Dr. Caldwell-Barr, Dr. Johnson, Dr. Kumke, Dr. McLaren, Dr. Nelson. The motion is also GRANTED with respect to Goodvine's claim that Warden Meisner, Security Director Nickel and Captain Morgan failed to protect him on October 12, 2011, and with respect to Goodvine's claim that Dr. Ankarlo and Dr. Heise denied him adequate care by denying him a transfer to the WRC in February 2011.  The defendants' motion is DENIED in all other respects.

2. Plaintiff's motion for summary judgment (dkt. # 234) is DENIED.

3. Plaintiff's motions for additional injunctive relief (dkts. # 173, # 206, # 267) are DENIED.

4. Plaintiff's motion for leave to amend the complaint (dkt. # 226) is DENIED.

5. Plaintiff's motion for assistance in recruiting counsel (dkt. # 230) is GRANTED.

6.  All other pending motions not addressed in this order are DENIED without

     prejudice to re-filing them after counsel has been located for Goodvine and

     the parties have appeared for a status conference.

Entered this 31st day of March, 2014.

                                    BY THE COURT:

                                    /s/

                                    _____
                                    WILLIAM M. CONLEY
                                    District Judge